**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 05-1139**

---

NATALIYA MIKHAYLOVNA FOX,

Plaintiff - Appellee,

versus

ENCOUNTERS INTERNATIONAL; NATASHA SPIVACK,

Defendants - Appellants,

and

JAMES M. FOX, II,

Defendant,

IRENA LIEBERMAN; DENNIS SCHEIB; TAHIRIH
JUSTICE CENTER; DEPARTMENT OF HOMELAND
SECURITY, Citizenship and Immigration
Services,

Parties in Interest.

---

**No. 05-1404**

---

NATALIYA MIKHAYLOVNA FOX,

Plaintiff - Appellee,

versus

ENCOUNTERS INTERNATIONAL; NATASHA SPIVACK,

                                    Defendants - Appellants,

          and

JAMES M. FOX, II,

                                    Defendant,


IRENA LIEBERMAN; DENNIS SCHEIB; TAHIRIH
JUSTICE CENTER; DEPARTMENT OF HOMELAND
SECURITY, Citizenship and Immigration
Services,

                                    Parties in Interest.

─────────────────

Appeals from the United States District Court for the District of
Maryland, at Greenbelt and Baltimore.  William D. Quarles, Jr.,
District Judge.  (CA-02-1563-WDQ)

─────────────────

Argued: March 15, 2006                    Decided: April 13, 2006

─────────────────

Before LUTTIG and SHEDD, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

─────────────────

Affirmed by unpublished per curiam opinion.

─────────────────

**ARGUED:** Paul Howard Zukerberg, Washington, D.C., for Appellants.
Randall K. Miller, ARNOLD & PORTER, L.L.P., Washington, D.C., for
Appellee.  **ON BRIEF:** David M. Orta, Ross S. Goldstein, ARNOLD &
PORTER, L.L.P., Washington, D.C., for Appellee.

─────────────────

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

PER CURIAM:

This is a tort case brought by a Ukranian woman, under Virginia law, against an international matchmaking agency headquartered in Maryland and also against such agency's founder and sole owner. As a recruit of the agency, plaintiff was matched for marriage with an American citizen who began mentally abusing her only two months after the couple married and began physically abusing her approximately five months after the couple married. The case went to trial before a jury on various tort theories, and the jury found in favor of the plaintiff on all claims, awarding her $92,000 in compensatory damages and $341,500 in punitive damages. The international matchmaking agency and its founder have appealed with respect to all claims. We affirm.

I.

The defendants are Encounters International (EI) and Natasha Spivack (Spivack) (collectively the Defendants).[1] EI is a Maryland corporation with offices in Rockville, Maryland; Moscow, Russia; Yaroslavl, Russia; and Kiev, Ukraine. American male clients of EI pay a membership fee of $1,850 plus additional fees for various

---

[1]Because the defendants/appellants are asking us, inter alia, to reverse the district court's denial of their motion for judgment as a matter of law filed pursuant to Federal Rule of Civil Procedure 50(b), we consider the evidence in the light most favorable to the plaintiff. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000); Bryte v. American Household, Inc., 429 F.3d 469, 475 (4th Cir. 2005).

matchmaking services.  At all times relevant to this case, EI distinguished itself from other matchmaking agencies by claiming a 95% success rate with matches and claiming to establish a personal relationship with each woman who joined.  EI uses its 95% success rate as one of its core marketing tools.

In April 1998, in Kiev, EI introduced then Nataliya Derkach (Plaintiff) to EI member Geoffrey Hermesman (Hermesman).  For a fee paid to EI by Hermesman, EI contacted Plaintiff, who was then a member of the Wind of Wanderer matchmaking agency.  Then, consistent with representations on EI's website, EI assisted Hermesman in bringing Plaintiff to the United States, including by telling Plaintiff how to complete immigration paperwork to gain entry into the United States.[2]  Indeed, EI's website states:

> There is immigration paperwork that we will help your woman to complete while you are still in Moscow or Kiev. Step by step we'll guide you and your fiance[e] through the bureaucratic hurdles of the immigration process . . . at no extra charge.

(E.A. 17).

When Hermesman and Plaintiff decided not to pursue a relationship two weeks after she arrived in the United States, Defendants induced Plaintiff to remain an EI member and introduced her to EI member James Fox.  EI's website contained Spivack's

---

[2]Plaintiff officially joined EI at some point and, according to the EI website, EI posted her picture in its database of recruits.

following description of the events leading to Defendants'
introduction of Plaintiff to James Fox:

> Although I introduced James Fox of Virginia and Natalia
> Derkach from Kiev a few days before they came to EI
> Saturday Club, I believe that this event solidified their
> mutual attraction.  A couple of months ago James was
> briefly engaged to another EI woman client from Kiev but
> that relationship did not feel right for either one of
> them when this woman came to the United States.  More
> mature of the two of them James was determined to work
> out the differences; therefore he was very disappointed
> when Lena decided to leave for the Ukraine after a couple
> of weeks together in order to remain "just friends."
> Natalia's story was not a happy one either.  She came as
> a fiancee of one of EI clients who did not feel that she
> was the right woman for him after spending with her one
> day in Kiev and a couple of weeks in Virginia.  By pure
> accident she missed the plane which would have taken her
> back to Kiev.  Trying to calm her down when she was
> crying in my office I told her that I'll introduce her to
> other EI clients. "They are the most serious about
> commitment and family, financially and mentally stable,
> they are not cheap -- the horror stories about cheap
> Americans do not apply to EI clients -- they are the best
> of the best single men on the 'market' -- I told her --
> because they joined EI showing their trust that we have
> the best women like you.  Don't worry, you are in the
> right place to be and I'll take care of you."  Natalia
> raised her big, red from tears eyes at me and smiled with
> appreciation.

(E.A. 31-32).

During the trial in this case, Plaintiff testified as follows
regarding Spivack's representations to her about James Fox:

> Well, James was the best man.  He was her favorite
> client. He was very good.  She said that he will be so
> good that I was so lucky that I was there at that time,
> because otherwise he would be married to that other
> woman, and I would never knew [sic] about him.  She said
> that she has her favorite other client who [was] going to
> come from some picture book and she is planning to
> introduce James, but now that -- of course if I'm with
> him, then of course she wouldn't, but she says that he's

- 5 -

> her best client, he's the youngest client, and he's -- he
> has everything.  He is ready.  He's ready to settle down
> to -- he just need[s] a good wife.

(J.A. 1946).  According to Spivack, EI's screening process of its male clients consists of her interviewing the male client about his expectations and why previous romantic relationships had failed.

Spivack, on behalf of herself and EI, spoke to Plaintiff in her native tongue and undertook to advise her about many matters including American customs and legal requirements, relationship counseling, prenuptial agreements, and the qualities of the male client to whom EI was introducing her.  At all times relevant to this case, Defendants knew that Plaintiff was a Ukrainian national who was unfamiliar with the language, laws, and customs of the United States.  Defendants also expressly held themselves out on EI's website as relationship counselors:

> If you ever need someone to talk to, we'll be available
> to advise you . . . or her . . . with any suggestions for
> adjusting to your new life together.

(E.A. 17).  EI links its counseling services to its 95% success rate.

Just two months after James Fox and Plaintiff were married in November 1998, James Fox began to subject Plaintiff to emotional abuse.  Such abuse began with small instances of cruel name calling and escalated over time to his angrily throwing a cooked potato past her head and smashing a full glass of Pepsi Cola against the kitchen wall when Plaintiff refused to drink from it after he had

spit in it, all resulting in Plaintiff being in an increasingly terrorized state.

In May 1999, James Fox began to physically abuse Plaintiff by chasing her into a bedroom closet, pinning her against the wall, screaming loudly in her ear that she is a stupid idiot, and then biting her finger so hard that her finger showed bite and bruise marks for two weeks.  Over time the physical abuse escalated.  For example, on the evening of December 29, 1999, James Fox threw Plaintiff, then four months pregnant, on the bed, violently grabbed her leg with both hands in his expressed attempt to break it, and hit Plaintiff in the face causing her lip to bleed when she screamed in pain about her leg.

On three separate occasions, once in January 2000, once in March 2000, and once in April 2000, Plaintiff sought Spivack's counseling and advice with regard to the violent physical and mental abuse that she was suffering at the hands of James Fox. Plaintiff had occasion to be in the presence of Spivack during these times because Plaintiff and James Fox attended the monthly social event that Spivack hosted for EI clients and married couples who met through EI.  For example, during the January 2000 social, Plaintiff told Spivack about the evening of December 29, 1999; specifically that James Fox had beaten her and terrorized her while pregnant, leaving her with a busted lip and bruises, and that she was so afraid of him beating her again that once he left the

apartment for a while, she fled on foot and spent the entire night in a nearby Wal-Mart. At the April 2000 social, Plaintiff specifically told Spivack that James Fox was becoming increasingly abusive and had chased her with a broken piece of glass, put it on her neck, and then told her he hated her, causing her to be "really scared." (J.A. 1126).

In response to Plaintiff's repeated reports of abuse and request for advice, Spivack always minimized the abuse Plaintiff suffered, advising her that it was nothing to worry about. With respect to the December 29th beating specifically, Spivack advised Plaintiff that "'All Americans--all American men are crazy.'" (J.A. 1123). Spivack continued: "'Maybe you just listen to him, and do what he says.'" Id. Spivack repeatedly advised Plaintiff that she had only two options, work things out with James Fox or be deported back to the Ukraine. Based upon this advice, Plaintiff remained in the marriage and awaited the birth of her daughter.

On July 6, 2000, approximately three weeks after Plaintiff gave birth to her daughter Sophia, James Fox subjected Plaintiff to a final violent episode. Specifically, James Fox physically and verbally abused Plaintiff for approximately two hours, including threatening to kill her while holding a gun to her head. Shortly thereafter, Plaintiff called an ambulance because of severe chest pain. The ambulance took Plaintiff to the local hospital where she was treated by Air Force Lt. Col. Marilyn Perry, M.D. Plaintiff

had numerous physical injuries including contusions and swelling on her face; hand marks on her arms (indicating that she was violently grabbed and/or shaken); a human bite to her hand; and contusions on her chest. Dr. Perry -- board certified with substantial experience with domestic abuse -- also testified that it was clear to her that Plaintiff had been terrorized and was a victim of domestic abuse.

Immediately after leaving the hospital, Plaintiff and her baby moved into a battered women's shelter at the urging of the hospital staff. With one minor exception, Plaintiff and her newborn baby lived at that shelter for seven months from July 2000 through January 2001. The minor exception was when Plaintiff and her baby stayed for a short time in a house on property owned by James Fox. Plaintiff and her daughter moved back to the shelter because the house was not appropriate for her or her baby. In early 2001, James Fox obtained a divorce of Plaintiff in Haiti.

At trial, Plaintiff's mental health counselor, Rebecca Hamilton, and Giselle Hass, Psy.D., testified about the significant psychological injuries that Plaintiff suffered as a result of the abuse. Such injuries required Plaintiff to undergo professional counseling for seven months.

Once safe at the battered women's shelter, Plaintiff for the first time learned about the battered spouse waiver. In general, the battered spouse waiver allows an alien who validly resides in

the United States based solely upon the sponsorship of her United States citizen spouse to leave an abusive relationship with such spouse without fear of being immediately deported. 8 U.S.C. §§ 1154, 1229b(b)(2). On April 2, 2001, Plaintiff petitioned for a battered spouse waiver, which the Immigration and Naturalization Service (INS) granted on May 29, 2001. There was no appeal. Subsequently, Plaintiff petitioned for adjustment of status as a permanent resident of the United States, which petition was granted.[3] Plaintiff currently lawfully resides in Virginia and is employed as a civil engineer.

The record is undisputed that Spivack knew about the battered spouse waiver during the times that Plaintiff had confided in her about the physical and mental abuse that James Fox inflicted upon her. The record is also undisputed that Spivack, nor any other agent or employee of EI, ever informed Plaintiff about the battered spouse waiver. Notably, at all times relevant to this case, EI was governed by the Mail Order Bride Act (MOBA), 8 U.S.C. § 1375. As part of this 1996 legislation, Congress found that there was a heightened risk of domestic abuse in relationships formed by international matchmaking agencies and that women who used such services are "unaware or ignorant of United States immigration

---

[3]The Department of Homeland Security appealed the IJ's grant of Plaintiff's petition to adjust her status on the ground that she initially filed improper immigration forms shortly after her marriage to James Fox. The Board of Immigration Appeals affirmed, without opinion, on March 21, 2005.

law." 8 U.S.C. § 1375(a). MOBA required that "[e]ach international matchmaking organization doing business in the United States shall disseminate to recruits, upon recruitment, such . . . information as the [INS] deems appropriate, . . . including information regarding . . . the battered spouse waiver."[4] 8 U.S.C. § 1375(b)(1) (emphasis added).

Finally, the record is undisputed that EI's website featured Plaintiff's name and likeness throughout the relevant time period, including through trial. Defendants used Plaintiff's name and likeness to portray her as a happy and satisfied customer even after Defendants had actual knowledge that James Fox physically and mentally abused Plaintiff and that Plaintiff was decidedly not a happy customer. Indeed, Defendants placed a picture of Plaintiff taken when she was either six or seven months pregnant (taken in

---

[4]We note that on January 5, 2006, President George Bush signed into law the "International Marriage Broker Regulation Act of 2005," H.R. 3402, Public Law No. 109-162, Title VIII, Subtitle D, with an effective date of March 6, 2006. The new law seeks to extensively regulate the international matchmaking industry. Among other things, it requires all United States citizens who petition for a fiancee or spousal visa to provide more personal background information to United States Immigration Officials and the State Department than ever before. 8 U.S.C. § 1375a. The new law also puts significant obligations on international matchmaking agencies to investigate the background of its clients. For example, such agencies will be required to search the National Sex Offender Registry or State sex offender public registry for the names of its United States clients. 8 U.S.C. § 1375a(d)(2)(A)(I).

Notably, the law repeals 8 U.S.C. § 1375. Pub. L. 109-162, Title VII, § 833(g). However, the repeal does nothing to affect the issues before us on appeal.

March or April 2000) on the EI website.  It is undisputed that EI never obtained written consent as required by the relevant Virginia statute to place any of these pictures on its website.  Virginia Code § 8.01-40(A).

Plaintiff subsequently sued Defendants and James Fox in the United States District Court for the District of Maryland.  James Fox settled with Plaintiff for $115,000.  Plaintiff's claims against the Defendants went to trial before a jury on November 8, 2004.  The jury considered the following claims against Defendants: (1) actual or constructive fraud under Virginia common law; (2) deceptive and unfair trade practices under Virginia statutory law; (3) unauthorized appropriation of name and likeness under Virginia statutory law; (4) negligence/breach of fiduciary duty under Virginia common law; and (5) defamation under Virginia common law.[5] Defendants had two counterclaims:  (1) actual or constructive fraud under Virginia common law; and (2) conspiracy to injure business under Virginia common law.

---

[5]The defamation claim was based upon Spivack's telling other EI clients during the course of this litigation that Plaintiff had been convicted of drug crimes in the Ukraine and Turkey.  During discovery in this case, James Fox produced what the governments of Ukraine and Turkey have certified are counterfeit criminal records. Defendants defended against the defamation claim on the ground that they had a reasonable belief that the documents were authentic.  In response, Plaintiff argued that given the fact that James Fox was being criminally charged with domestic abuse and had a huge incentive to discredit his wife, Defendants were unreasonable in telling third parties that Plaintiff had been convicted of drug crimes in the Ukraine and Turkey.

Defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 at all appropriate times. The district court denied the motions.

The trial ended on November 18, 2004. After considering all of the evidence, the jury found in favor of Plaintiff on all claims and awarded her $92,000 in compensatory damages and $341,500 in punitive damages. The jury also found in favor of Plaintiff with respect to Defendants' counterclaims. Following the jury's verdict, Defendants renewed their motion for judgment as a matter of law, which the district court again denied. This timely appeal followed, in which Defendants raise numerous assignments of error. Several are worthy of our addressing separately.

II.

Defendants challenge the district court's denial of their Rule 50(b) motion for judgment as a matter of law with respect to Plaintiff's negligence/breach of fiduciary duty claim on the basis that, inter alia, there was insufficient evidence to establish that Defendants and Plaintiff had a fiduciary relationship, and, therefore, they cannot be liable for breach of fiduciary duty. This challenge is without merit.

We review the denial of a motion for judgment as a matter of law de novo. Bryte v. American Household, Inc., 429 F.3d 469, 475 (4th Cir. 2005). In reviewing the evidence in the record, we must

draw all reasonable inferences in favor of the non-moving party and we may not make credibility determinations or weigh the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-150 (2000). Although we should review the record as a whole, we must disregard all evidence favorable to the moving party that a jury would not be required to believe. Id. at 151. "That is, [we] should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. (internal quotation marks omitted).

Under Virginia law, the elements of a negligence cause of action are: (1) a legal duty on the part of the defendant; (2) breach of that duty; (3) a showing that such breach was the proximate cause of injury; and (4) such injury resulted in damage to the plaintiff. Blue Ridge Service Corp. of Va. v. Saxon Shoes, Inc., 624 S.E.2d 55, 62 (Va. 2006). Plaintiff sought to prove her negligence cause of action, inter alia, on the theory that Defendants and she had a common law fiduciary relationship under which they owed her fiduciary duties which they breached, proximately causing her injury and resulting in her suffering damages.

Under Virginia law, whether a fiduciary relationship exists is a question of fact. Allen Realty Corp. v. Holbert, 318 S.E.2d 592,

595 (Va. 1984).  A fiduciary relationship exists "when special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence."  Id. (internal quotation marks omitted).  Based upon this duty, the fiduciary is obligated to tell his principal about "anything which might affect the principal's decision whether or how to act."  Id. (internal quotation marks omitted).  See also State Farm Mut. Auto. Ins. Co. v. Floyd, 366 S.E.2d 93, 97 (Va. 1988) ("A fiduciary owes total fidelity to the interests of his principal.  While the relationship continues, he may engage in no self-dealing which may have any adverse effect on the interests of his principal.").  Critically, Plaintiff did not need to prove that Defendants had a fiduciary relationship with all of EI's female recruits, just Plaintiff.

Here, viewing the evidence in the light most favorable to Plaintiff, as we must, sufficient evidence was before the jury for it to reasonably find that Defendants had a fiduciary relationship with Plaintiff.  Spivack testified that she holds herself out as an expert in the field of matchmaking.  Specifically, Spivack told Plaintiff that she was a psychologist and screened very carefully the men who EI recommended their foreign female clients marry.[6] Spivack always spoke to Plaintiff in Russian, which comforted

---

[6]Spivack testified that she is not actually a psychologist, but has taken many courses in psychology.

Plaintiff.  She also undertook, through her actions and words, to advise Plaintiff, as a client of EI, regarding prenuptial agreements, immigration matters, relationship counseling, and American/Eastern Europe cultural/language issues.  Finally, EI's website touted that Spivack established a relationship of trust with Plaintiff:

> Natalia's story was not a happy one either.  She came as a fiancee of one of EI clients who did not feel that she was the right woman for him after spending with her one day in Kiev and a couple of weeks in Virginia.  By pure accident she missed the plane which would have taken her back to Kiev.  Trying to calm her down when she was crying in my office I told her that I'll introduce her to other EI clients.  "They are the most serious about commitment and family, financially and mentally stable, they are not cheap -- the horror stories about cheap Americans do not apply to EI clients -- they are the best of the best single men on the 'market' -- I told her -- because they joined EI showing their trust that we have the best women like you.  <u>Don't worry, you are in the right place to be and I'll take care of you</u>."  Natalia raised her big, red from tears eyes at me and smiled with appreciation.

(E.A. 31-32) (emphasis added).  Also, Spivack testified that Plaintiff was not her friend, and, therefore, she did not give Plaintiff advice as a friend.  Finally, Plaintiff's vulnerabilities while in the United States, including language barriers, being very far from her friends and family in the Ukraine, and being subject to the complexities of immigration laws were all known to Spivack, and, therefore, support the existence of a fiduciary relationship. <u>Cf.</u>  <u>Delk v. Columbia</u>, 523 S.E.2d 826, 831-32 (Va. 2000) (defendant's knowledge of plaintiff's particular vulnerabilities is

evidence of special relationship under Virginia law). <u>See also</u> <u>Snortland v. State</u>, 615 N.W.2d 574, 578-79 (N.D. 2000) (fiduciary relationship generally arises when there is an unequal relationship between the parties; the party reposing the confidence must be in a position of inequality, dependence, weakness, or lack of knowledge).

We hold that, when all of this evidence is woven together, the reasonable juror could find that Spivack, on behalf of herself and EI, engaged in intentional efforts to gain Plaintiff's trust, confidence, and loyalty in order that Plaintiff would marry James Fox, continue to be married to James Fox, and create another EI success story.

We also hold the jury had sufficient evidence before it to find by a preponderance of the evidence that Defendants breached their fiduciary duties to Plaintiff. Spivack admitted at trial that she knows that some women stay in abusive relationships for fear of being deported. Spivack also testified that she knew about the battered spouse waiver in 1999, prior to Plaintiff confiding in her about James Fox's physical and mental abuse. The record is undisputed that, despite this knowledge, when Plaintiff repeatedly complained to Spivack about such abuse and sought advice about the situation, Spivack never told Plaintiff about the battered spouse waiver. From this evidence, the jury could have reasonably found that Defendants withheld knowledge of the battered spouse waiver

- 17 -

from Plaintiff because they wanted to keep up EI's 95% matchmaking success rate, which rate happened to be, as Spivack herself testified at trial, one of EI's core promotional selling points. A divorce between Plaintiff and James Fox would have negatively affected EI's 95% success rate.

As for the analytically intertwined elements of proximate cause and damages, Plaintiff testified that had she known about the battered spouse waiver prior to James Fox's brutal physical and mental attack in July 2000, she would have left him prior to that time, and, therefore, would not have suffered the physical and mental injuries that she did as the result of such attack. From this testimony, the jury could reasonably find that had Defendants informed Plaintiff of the battered spouse waiver prior to James Fox's July 2000 attack, Plaintiff would not have suffered the physical and mental injuries that she did from the attack.

Defendants' primary argument in challenge to the jury's finding of proximate cause is that Plaintiff was not legally entitled to a battered spouse waiver at the time she complained to Spivack about James Fox's abuse, and, therefore, she would have been subjected to James Fox's brutal attack even if she had known about the waiver prior to the attack. In support, Defendants specifically claim that Plaintiff committed immigration fraud, and, therefore, was ineligible for the battered spouse waiver. See 8 U.S.C. §§ 1154(a)(1)(B)(ii), 1229b(b)(2)(A)(iii) (alien must be

person of good moral character).  Defendants argued before the jury that Plaintiff committed immigration fraud by:  (1) entering the United States in March 1998 with Hermesman on a fiancee visa with no intent to marry him, and (2) in early 1999, knowingly using immigration paperwork from James Fox's previous fiancee in applying for adjustment of her immigration status with the intent to defraud the INS.

The jury obviously rejected Defendants' argument.  At trial, Plaintiff gave her version of what happened when she first applied for adjustment of status in early 1999.  Plaintiff's explanation showed that she did not commit immigration fraud and that she answered all of the INS's questions honestly.  The jury obviously credited Plaintiff's version of her actions in applying for adjustment of her immigration status, which we must accept on appeal.   To summarize, from the evidence before the jury, the jury could have reasonably found that Defendants owed Plaintiff fiduciary duties which they breached by failing to inform her of the battered spouse waiver when she put them on notice about James Fox's physical and mental abuse, which breach proximately caused Plaintiff to suffer emotional and physical injuries at the hands of James Fox.  Accordingly, we reject Defendants' challenge to the district court's denial of their motion for judgment as a matter of law on the basis that the evidence does not support a fiduciary relationship or the remaining elements of Plaintiff's claim

alleging negligence based upon fiduciary duty.  We have also considered Defendants' remaining assignments of error with respect to Plaintiff's negligence/breach of fiduciary duty claim and find them to be without merit.

III.

Defendants next challenge the district court's denial of their Rule 50(b) motion for judgment as a matter of law with respect to Plaintiff's claim under Virginia law for actual or constructive fraud.  Their challenge is without merit.

The elements of a claim for actual fraud under Virginia law are:  "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled."  Evaluation Research Corp. v. Alequin, 439 S.E.2d 387, 390 (Va. 1994).  Constructive fraud under Virginia law differs from actual fraud under Virginia law "in that the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently although resulting in damage to the one relying on it."  Id.  The elements of either actual fraud or constructive fraud must be proven by clear and convincing evidence. Id.  Thus, "[a] finding of either actual or constructive fraud requires clear and convincing evidence that one has represented as true what is really false, in such a way as to induce a reasonable

person to believe it, with the intent that the person will act upon this representation." Id.

Defendants contend that, inter alia, the district court should have granted their motion for judgment as a matter of law with respect to Plaintiff's fraud/constructive fraud claim due to lack of evidence. We disagree.

Among other misrepresentations, Plaintiff sought to prove that Spivack, on behalf of herself and EI, committed actual or constructive fraud by falsely telling her on several occasions that, in light of her complaints of James Fox's physical and mental abuse, she only had two courses of action available to her: (1) remain married to and living with James Fox; or (2) return to the Ukraine. From the evidence set forth in detail in Part II supra, a reasonable jury could find, by clear and convincing evidence, that Spivack, on behalf of herself and EI, intentionally withheld knowledge regarding the battered spouse waiver from Plaintiff in an effort to preserve one of EI's core promotional selling points, i.e., EI's 95% success rate. The record also shows by clear and convincing evidence that Plaintiff reasonably relied upon Spivack's explanation of her two courses of action to her physical and mental detriment. We have also considered Defendants' remaining assignments of error with respect to Plaintiff's fraud/constructive fraud claim and find them to be without merit. Accordingly, we hold the district court did not err in denying Defendants' Rule

50(b) motion for judgment as a matter of law with respect to Plaintiff's fraud/constructive fraud claim.

IV.

Turning to the topic of damages, Defendants make several arguments in challenge of the jury's compensatory and punitive damages award. We will address two--(1) Defendants' argument that they deserve credit for James Fox's $115,000 settlement with Plaintiff; and (2) Defendants' argument that the punitive damage award is excessive in violation of the Due Process Clause.

A. Credit for Settlement.

Relying upon Virginia Code § 8.01-34, Defendants moved post-verdict to receive credit for James Fox's $115,000 settlement with Plaintiff on the basis that James Fox was a joint tortfeasor and Plaintiff suffered indivisible injury. Virginia Code § 8.01-34 provides: "Contribution among wrongdoers may be enforced when the wrong results from negligence <u>and involves no moral turpitude</u>." <u>Id.</u> (emphasis added). On appeal, Defendants contend the district court erred by denying their motion.

We affirm the district court on this issue. Defendants' moral turpitude, and thus their nonentitlement to relief under § 8.01-34, is substantiated by the jury's award of punitive damages, because the jury was instructed that it could only award punitive damages if it found "by the greater weight of the evidence that the

opposing party acted with actual malice toward that party or acted under circumstances amounting to a willful and wanton disregard of that party's rights . . . ."  (J.A. 2130).

B.    Due Process Clause.

Defendants argued below and argued on appeal that the jury's punitive damages award is excessive in violation of the Due Process Clause of the Fifth Amendment, and, therefore, the district court erred in denying its motion to reduce it.  Defendants' argument is without merit.

Compensatory damages are intended to redress the concrete loss that plaintiff has suffered by reason of the defendant's wrongful conduct.  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003).  In contrast, punitive damages are aimed at deterrence and retribution.  Id.

Defendants argue that the jury's award of punitive damages is excessive under the guideposts set forth in BMW of North Am., Inc. v. Gore, 517 U.S. 559, 562 (1996).  We disagree.  BMW sets forth three guideposts to consider de novo in reviewing a punitive damage award for excessiveness under the Fourteenth Amendment[7]:  "(1) the

_____

[7]We note that BMW involved an excessiveness challenge to a punitive damage award under the Due Process Clause of the Fourteenth Amendment, while Defendants' challenge to the punitive damage award here is properly brought under the Due Process Clause of the Fifth Amendment, given that the governmental action challenged involved a federal tribunal.  Johnson v. Hugo's Skateway, 974 F.2d 1408, 1411 n.1 (4th Cir. 1992) (en banc) (punitive damage award arising from federal tribunal is properly challenged under the Due Process Clause of the Fifth Amendment).

degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." State Farm Mut. Auto. Ins. Co., 538 U.S. at 418 (citing BMW).

Here, after considering all of the evidence before it, the jury awarded Plaintiff $92,000 in compensatory damages and $341,500 in punitive damages. Accordingly, the ratio of punitive damages to compensatory damages--the focus of the second guidepost--is less than four to one. Under the Supreme Court's most recent pronouncement on this issue, the four to one ratio is not excessive. State Farm, 538 U.S. at 425 ("an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety") (emphasis added).

The first guidepost--i.e., the degree of reprehensibility of the defendant's misconduct--does not suggest excessiveness in this case either. Defendants' knowing allowance of this woman to remain in such a physically and mentally abusive relationship while she

---

Because Defendants urge review of the punitive damage award under BMW, Plaintiff does not object, and there appears no sound reason to apply a different excessiveness test in the Fifth Amendment context as opposed to the Fourteenth Amendment context, Morgan v. Woessner, 997 F.2d 1244, 1255 (9th Cir. 1993) ("The two Clauses should be applied in the same manner when two situations present identical questions differing only in that one involves a proscription against the federal government and the other a proscription against the States."), we apply BMW.

was pregnant is highly reprehensible.  Finally, the last guidepost--i.e., the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases--does not offer us much guidance one way or the other.  For example, while MOBA caps civil penalties at $20,000 for each failure-to-disclose violation, 8 U.S.C. § 1375(b)(2)(A), a failure-to-disclose violation of MOBA does not take into consideration the willful and wantonness of Defendants' conduct here.  Neither party has pointed to any other civil-penalty schemes for our comparison.

In the final analysis, we have no basis to hold that the jury's punitive damage award is excessive.


V.

We have carefully reviewed Defendants' remaining assignments of error and conclude they are without merit.  Accordingly, we affirm the judgment in favor of Plaintiff below in toto.[8]


AFFIRMED

---

[8]Upon Plaintiff's post-oral argument motion, we take judicial notice that, on March 10, 2006, the United States issued Plaintiff official notice approving her application to adjust to permanent resident status and a Permanent Resident Card.