# Evaluation Research Corporation, et al.

v.

# Raymond Alequin

Record No. 930333

January 7, 1994

Present: Carrico, C.J., Compton, Stephenson, Whiting, Hassell, and Keenan, JJ., and Cochran, Retired Justice

*Donna J. Kraus (James S. Kurz; Hazel & Thomas,* on briefs), for appellants.

*Edward J. Tolchin (Brian Taylor Golstein; Fettmann & Tolchin,* on brief), for appellee.

JUSTICE KEENAN delivered the opinion of the Court.

The dispositive issue in this appeal is whether there is sufficient evidence of fraud to support the jury's verdict in favor of the plaintiff in an action arising out of an employment termination.

In July 1990, Evaluation Research Corporation (ERC), a government contractor, hired Raymond Alequin, an electronic technician, to work as a shield test engineer in connection with a project at the Eglin Air Force Base in Florida. In November 1990, ERC terminated Alequin. Alequin filed an amended motion for judgment against ERC and its manager, Willard B. McDougal, asserting actions of actual and constructive fraud.

The evidence at trial showed that Alequin had been employed by Comsearch Applied Technology for about five years when he learned that ERC had a position available in his field that promised higher earnings than he was receiving at Comsearch. Alequin discussed the position with McDougal, accepted employment with ERC, and resigned from Comsearch. He began work for ERC on a project at the Eglin Air Force Base and remained there about three months.

However, in November 1990, the general contractor on the project unexpectedly terminated its subcontract with ERC and assigned to other contractors the work that ERC had expected to receive.

ERC's president, James Lasswell, testified that, at the time Alequin was hired, the company had projected a great deal of shield testing work extending over a nine-month period, but that "[t]hings seemed to stop right around August" of 1990 when the United States government began its Desert Shield and Desert Storm operations. Alequin was discharged, together with a number of other employees, because ERC had no work for them on any contracts.

Alequin's claim of fraud was based solely upon his conversations with McDougal in June 1990 when he was considering employment with ERC. He claimed that McDougal fraudulently induced him to leave his employment with Comsearch by misrepresenting the nature of employment with ERC. Alequin testified that he was accustomed to working on an "overhead" basis, meaning that his employment would continue even if the company did not have a specific contract on which he could work at a given time. He further testified that other companies in his industry used a different hiring method, which he called "specific contract" employment. Alequin attempted to explain the term by providing an example of a technician he had met who was assigned by the United States Postal Service to a certain project and "was there specifically for a contract. Once the contract was over, he was gone."

Alequin testified that he was concerned about being "laid off" and tried to find out on what basis ERC hired. In answer to questions posed by his counsel, Alequin made the following assertions:

Q. Did you ask [McDougal] any more questions about working at ERC?

A. At that point, I specifically asked him—and the reason I brought this up was because friends of mine sort of clued me in and said, what happens after the project down at Eglin is over? So, that is why I brought that up to Mr. McDougal; and I specifically asked him, what happens when the job is over?

Q. What did he tell you?

A. He told me that they did not hire on a contract basis. He told me specifically, and this is quote unquote, that they would

find another place for me in ERC, that they did Navy contracts, and they did other types of work which I was skilled to do, that there would be another place for me, that they had a lot of contracts up and coming.

Lasswell testified as an adverse witness for Alequin that ERC did not normally "keep people on overhead." However, he also stated that ERC was not acquainted with the term "contract specific basis." He testified that ERC's employees typically worked sequentially on a series of contracts, or sometimes worked simultaneously on several contracts, but that ERC's policy was to employ people only when it could charge their time to a contract.

McDougal, when called as an adverse witness, likewise testified that ERC's policy was "not to keep people on overhead for an extended period of time." He denied telling Alequin that "we don't hire on a contract specific basis."

McDougal testified for ERC that he had 12 years of experience in his field, and that his understanding of employment in the industry, including his own position, was that jobs continued "as long as the company was successful, and depending on how much money and how many contracts we could bring in." He stated that ERC had trained him with regard to interviewing prospective employees, and that he was instructed not to promise "permanent" employment, because "permanent implies that there is a tenured position available."

McDougal testified that, during their interview, Alequin asked "what he would do at the conclusion of the Eglin work." McDougal testified:

> I told him that the company policy was to move engineers from one job to another, that we were in the business of selling engineer manhours, and that our ability to do that depended on having qualified engineers available when jobs were open, and that he would be considered for any of those positions which he was qualified for at the time that the Eglin job was completed.

> I told him that the nature of our business is such that the job lasts as long as the contract lasts, as long as there is money in the contract. And he interrupted me and told me that he understood the nature of the business. And that concluded that line of discussion.

McDougal further testified that ERC does not keep employees on overhead, but that he did not communicate this fact to Alequin at their interview, because "[w]e weren't discussing overhead. I did not talk

about how long we keep people on overhead. I told him we move people from job to job, if jobs are available and if we have funding for it." McDougal also testified:

> I told him that we tried to move people from contract to contract. When one job would finish, we would move those people to another contract, because we were in the business of selling engineers' hours, and we would try to find work for him; and if they did good work, we would have clients who would come to us and ask us for their work, and we would move people from job to job.

Richard Platt, a vice president with ERC, was present at Alequin's interview with McDougal and testified that neither Platt nor McDougal promised Alequin that he would be given other work after the Eglin project, and that when Alequin asked what would happen when the project was completed, McDougal responded that "based on the availability of jobs at that point in time and his qualifications, we would look to move him into another job." Platt further reported that, in response to a question from Alequin concerning what would happen after the Eglin job, "Mr. McDougal said, there are no guarantees in this business. And I believe that is when Mr. Alequin acknowledged that he understood how this business works."

ERC moved to strike the evidence at the conclusion of Alequin's case and the trial court reserved decision on the motion until after the jury's verdict. The jury was instructed on theories of actual and constructive fraud. Without specifying on which theory it based its verdict, the jury awarded Alequin $100,000. The trial court denied ERC's motion to strike and motion to set aside the verdict and entered judgment on the verdict.

■ On appeal, ERC argues that Alequin failed to prove fraud because his evidence was insufficient to show clear and convincing proof of a misrepresentation regarding the nature of the work ERC offered him. In reviewing the evidence, we first recognize that "a party who comes before us with a jury verdict approved by the trial court 'occupies the most favored position known to the law.'" *Ravenwood Towers, Inc. v. Woodyard*, 244 Va. 51, 57, 419 S.E.2d 627, 630 (1992). A trial court's judgment is presumed to be correct, and on appeal, we must view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the prevailing party at trial. *Id.*

■ If, however, when this standard is applied, it appears that the judgment is plainly wrong or without evidence to support it, the

appellate court must set it aside. *Thompson v. Bacon,* 245 Va. 107, 111, 425 S.E.2d 512, 514 (1993); *Whichard v. Nee,* 194 Va. 83, 89, 72 S.E.2d 365, 369 (1952). On review of the evidence in accordance with these principles, we conclude that Alequin's evidence was insufficient, as a matter of law, to establish either actual or constructive fraud.

One who advances a cause of action for actual fraud bears the burden of proving by clear and convincing evidence: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. *Bryant v. Peckinpaugh,* 241 Va. 172, 175, 400 S.E.2d 201, 203 (1991); *Winn v. Aleda Constr. Co.,* 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984). Constructive fraud differs from actual fraud in that the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently although resulting in damage to the one relying on it. *Nationwide Mut. Ins. Co. v. Hargraves,* 242 Va. 88, 92, 405 S.E.2d 848, 851 (1991); *Kitchen v. Throckmorton,* 223 Va. 164, 171, 286 S.E.2d 673, 676 (1982). However, as with actual fraud, the elements of constructive fraud also must be proved by clear and convincing evidence. *Nationwide Ins. Co. v. Patterson,* 229 Va. 627, 629, 331 S.E.2d 490, 492 (1985).

A finding of either actual or constructive fraud requires clear and convincing evidence that one has represented as true what is really false, in such a way as to induce a reasonable person to believe it, with the intent that the person will act upon this representation. *Jefferson Standard Life Ins. Co. v. Hedrick,* 181 Va. 824, 833-34, 27 S.E.2d 198, 202 (1943). In the present case, Alequin sought to prove that ERC and its agent, McDougal, represented to him that ERC "did not hire on a contract basis," and that this representation was false.

The evidence was in conflict as to whether McDougal made such a statement. However, accepting as true the evidence most favorable to Alequin, we hold that Alequin failed to prove by clear and convincing evidence that McDougal's statement was false. Alequin's evidence regarding industry hiring practices consisted primarily of his own testimony, in which he contrasted his own experience working "on overhead" with short-term, single-contract jobs such as that worked by the Postal Service employee he knew, who was "gone" once the contract was completed. Although the testimony of ERC's representatives showed that ERC did not make a practice of keeping employees "on overhead," this testimony did not prove that ERC engaged in short-term hiring meeting Alequin's definition of "specific

contract" employment. Alequin failed to prove that McDougal's statement, that ERC "did not hire on a contract basis," carried with it the corollary inference that ERC instead hired on an overhead basis. Specifically, the evidence did not show that all employers in this line of business exclusively followed one or the other hiring practice. To the contrary, the testimony of ERC's employees suggested that there existed an industry practice lying between these two extremes. That evidence showed that ERC's practice was to "move people from job to job" and to "[have] qualified engineers available when jobs were open," rather than to dismiss employees after work on a specific contract was completed.

■ Therefore, we conclude that Alequin failed to prove by clear and convincing evidence that McDougal spoke falsely when he told Alequin that ERC "did not hire on a contract basis." Because proof of a false representation is an essential element of both actual and constructive fraud, the evidence is insufficient to support the jury's verdict on either theory.

For these reasons, we will reverse the judgment of the trial court and enter final judgment in favor of ERC and McDougal.

*Reversed and final judgment.*