**BANK OF SOUTHSIDE VIRGINIA,**
Plaintiff,

v.

**HOST & COOK, LLC, Defendant.**

**Civ.A. No. 3:06CV348.**

United States District Court,
E.D. Virginia,
Richmond Division.

Jan. 11, 2007.

Alan D. Wingfield, Megan C. Rahman, Troutman Sanders LLP, Richmond, VA, for Plaintiffs.

Lisa T. Hudson, Elaine R. Jordan, Sands, Anderson, Marks & Miller PC, Richmond, VA, Harold D. Mooty, Jr., Mooty & Associates PC, Montgomery, AL, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

This matter is before the Court on the MOTION FOR ENTRY OF DEFAULT JUDGMENT (Docket No. 6) filed by the plaintiff, Bank of Southside Virginia ("BSV") and the MOTIONS TO SET ASIDE ENTRY OF DEFAULT AND TO ENLARGE TIME TO FILE RESPONSIVE PLEADINGS OF THE DEFENDANT HOST & COOK, LLC (Docket Nos. 9 and 10) filed by the defendant, Host & Cook, LLC ("H & C"). The motions have been fully briefed and an evidentiary hearing has been held. For the reasons set forth below, the MOTION FOR ENTRY OF DEFAULT JUDGMENT (Docket No. 6) is granted and the MOTIONS TO SET ASIDE ENTRY OF DEFAULT AND TO ENLARGE TIME TO FILE RESPONSIVE PLEADINGS OF THE DEFENDANT HOST & COOK, LLC (Docket Nos. 9 and 10) are denied.

## STATEMENT OF FACTS

This declaratory judgment action arose out of the default on a promissory note that was secured by a lien on a hotel and the subsequent attempt by H & C to purchase the hotel. It is helpful, therefore, briefly to recount the dealings between BSV and H & C respecting H & C's efforts to purchase the hotel.

### A. Negotiations Related To The Sale Of The Hotel

In 2003, SRK Hospitality, LLC ("SRK") executed a Deed of Trust Demand Note payable to BSV. The note was secured by (1) a lien on a hotel in Fayetteville, North Carolina (the "Hotel"), in favor of BSV and (2) a Security Agreement lien on personal property associated with the Hotel. In 2005, SRK defaulted on the note, and BSV began taking steps to enforce its rights.

In October 2005, H & C, a North Carolina limited liability company of which Mashud Reza is the sole member, commenced negotiations with BSV to release its lien on the Hotel and the associated personal property, it being H & C's intent to buy them from SRK. On November 7, 2005, BSV and H & C executed a Lien Release Agreement in which BSV agreed to release its lien and security interest in the Hotel and related property in return for $3.5 million from H & C. The terms of the Lien Release Agreement were as follows:

(1) H & C was to pay BSV $10,000 on or before the date of execution (November 7, 2005), and H & C was to deliver $350,000 to an Escrow Agent;

(2) On the Lien Release Date—2:00 p.m. on January 31, 2006—H & C was to pay BSV the balance of the Lien Release Price ($3.14 million). Alternatively, if H & C delivered an additional $175,000 to the Escrow Agent by January 30, 2006, the Lien Release Date would be extended until February 28, 2006, whereupon the balance of the Lien Release Price would be $2.965 million. The Lien Release Agreement provided that "time is of the essence";

(3) If H & C strictly complied with the terms of the Lien Release Agreement, then these funds would be credited toward the Lien Release Price. If H & C failed strictly to comply, BSV would retain the $360,000 as liquidated damages.

In accordance with the Lien Release Agreement, H & C paid BSV $10,000 and delivered $350,000 to the Escrow Agent. However, H & C did not tender the Lien

Release Price to BSV on January 31, 2006, nor did H & C tender the $175,000 that would have extended the Lien Release Date to February 28. On February 1, 2006, the Escrow Agent disbursed the $350,000 to BSV.

Some time around or after[1] January 31, 2006 BSV and H & C discussed the possibility that H & C might acquire the Hotel and associated property by buying it at BSV's foreclosure sale on the Deed of Trust and Security Agreement that BSV had with SRK. To that end, H & C applied to BSV for a loan and, on February 22, 2006, BSV issued a proposed commitment letter (the "First Letter"), under which BSV proposed to loan H & C: (1) $3.14 million for H & C to acquire the Hotel, and (2) $360,000 for H & C to renovate it. The First Letter contained numerous other financing, operating, and management requirements. In order to accept the terms of the First Letter, H & C had to sign and return it to Robert Ford, a vice-president at BSV, by March 3, 2006 (the "Expiration Date"), or else the offer expired.

BSV delivered the First Letter on February 22. According to the affidavits of two BSV officers, J. Peter Clements and Robert S. Ford, Messrs. Clements and Ford met with Mr. Reza on February 27 to go over its terms. Mr. Reza objected to: (1) the proposed interest rate; (2) a requirement that other of Mr. Reza's businesses sign as guarantors; (3) a requirement that H & C pay delinquent property taxes on the Hotel at closing; and (4) the prepayment terms. In response, BSV sent Mr. Reza a revised proposed commitment letter (the "Second Letter") by multiple means on March 3 and March 6.[2] The parties met on March 30 to go over the terms of the Second Letter.

At some point after this, negotiations broke down.[3] On April 28, 2006, BSV gave written notice to H & C that it was terminating further discussions with respect to the acquisition of the Hotel. Several days later, BSV sold the Note and Deed of Trust to a third party.

## B. Procedural History And The Steps Made By H & C To Retain Counsel

On May 8, 2006, H & C retained William Scheil to provide legal services related to the attempt to acquire the Hotel from SRK and BSV. Mr. Scheil drafted a two-count complaint to be filed in a Virginia state court, and sent a copy of that pleading to BSV by way of a Demand Letter dated May 11, 2006. The Demand Letter stated that, if BSV failed to return H & C's "deposit" of $360,000 within seven calendar days, H & C would file the draft complaint.

The draft complaint asserted that: (1) H & C was entitled to $360,000, plus loss-of-expectation damages, because it timely had accepted the First Letter (and implicitly, that the $360,000 from the Lien Release Agreement was a component of the First Letter); and (2) that BSV and SRK had, in effect, defrauded H & C of $360,000 by hiding the fact that BSV was subsidizing the Hotel's operations, and that, if H & C had known about the subsidies, it never would have entered into the Lien Release Agreement in the first place.

On May 17, BSV filed this action for declaratory judgment, asking the Court to:

(1) "determine and adjudicate the rights and liabilities of the parties hereto with

---

**1.** Neither party's papers make clear when the discussions began.

**2.** H & C does not directly dispute this account, but claims that it "timely accepted the [First Letter] by signing and dating it on March 1, 2006, and returning it to BSV." BSV claims not to have received this acceptance until May 11 when it showed up as an attachment to papers filed in this action. BSV notes further that BSV met with Mr. Reza on March 30 to go over the terms of the Second Letter, and that at that meeting Mr. Reza never mentioned that he had accepted the First Letter. H & C has not refuted that showing.

**3.** BSV states in its Complaint that it cut off negotiations because "Host & Cook never provided BSV with evidence that Host & Cook had satisfied or could satisfy the Conditions [of the First and Second Letters]." H & C, on the other hand, claims that BSV kept it "at bay" while H & C waited for what it thought was a "friendly foreclosure," and that throughout this time period, H & C was "ready, willing, and able to purchase the Hotel." H & C Counterclaims ¶¶ 24–25.

respect to the Lien Release Agreement and [First or Second Letters]";

and,

(2) "find and declare that BSV is not obliged to pay Host & Cook $360,000 or any sum by virtue of (a) the Lien Release Agreement and/or the [First or Second Letters]; and/or (b) any transactions between the parties with respect to the Lien Release Agreement and the [First or Second Letters]; and/or (c) Host & Cook's attempt to purchase the Hotel and Personal Property"[4]

BSV sent a copy of the declaratory judgment action to Mr. Scheil on May 18. On May 19, legal service was made on the Secretary of the Commonwealth as H & C's statutory agent for service of process. The papers were forwarded by the Secretary of the Commonwealth to H & C, care of David B. Craig in Fayetteville, North Carolina by certified mail. Mr. Craig accepted service as H & C's registered agent on May 22. Thus, H & C's answer was due on June 12.

On May 18, Mr. Scheil informed Mr. Reza that he did not practice in the federal courts and therefore would not provide representation to H & C with respect to this action. Mr. Scheil referred Mr. Reza to William Bayliss of Williams Mullen LLP to serve as counsel. Beginning on May 18, Mr. Reza began to discuss with Mr. Bayliss whether Mr. Bayliss would represent H & C in this action. Ultimately, however, Mr. Bayliss was never retained, and never delivered a retention letter to Mr. Reza.

Mr. Reza left the country on vacation on May 25 and was away until June 12. On June 13, after Mr. Reza's return, Mr. Bayliss informed Mr. Reza that a response to the Declaratory Judgment Action would be due within 20 days of service, but that Mr. Bayliss did not know the date of service. Mr. Reza then contacted H. Dean Mooty, Jr., a lawyer who represents Mr. Reza in gasoline industry matters in Alabama. When Mr. Mooty returned to his office on June 15, he agreed to help Mr. Reza obtain local counsel.

On June 16, unable to confirm the status of service of process, Mr. Mooty contacted counsel for BSV, requesting that BSV agree

to a 10–day extension of the date for H & C's answer. BSV declined to agree to the requested extension. One June 22, BSV requested entry of default, and on June 23, the Clerk entered default pursuant to Federal Rule of Civil Procedure 55(a).

On June 28, Mr. Reza contacted Elaine Jordan at Sands Anderson Marks & Miller, PC, to serve as counsel. H & C retained Ms. Jordan on June 29.

BSV filed its motion for entry of default judgment on June 30. On July 17, H & C filed its motion to set aside entry of default and its motion for enlargement of time in which to file an answer and otherwise plead. These motions were briefed and evidentiary hearings were held on August 17 and September 5. On September 11, H & C was ordered to file its Answer and Counterclaims to help the Court ascertain whether H & C had any meritorious defenses or claims. Further briefing was ordered to address: (1) the sufficiency of H & C's Defenses; and (2) BSV's Motion for Entry of a Default Judgment. In that regard, at the September 5 hearing and the September 11 Order, the Court instructed H & C to provide evidentiary support for its putative defenses or claims.

## DISCUSSION

### I. Jurisdiction

H & C is a North Carolina company. BSV is a Virginia bank with its principal place of business in Virginia. The amount in dispute is at least $360,000. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

This declaratory judgment action is ripe. "[D]eclaratory judgment[ actions] ... must ... present a justiciable controversy rather than abstract, hypothetical or contingent questions." *Miller v. Augusta Mut. Ins. Co.*, 157 Fed.Appx. 632, 637 (4th Cir.2005) (unpublished) (quoting *St. Thomas–St. John Hotel & Tourism Ass'n v. United States Virgin Islands*, 218 F.3d 232, 240 (3rd Cir.2000)). There is no doubt that an actual case or controversy exists here. H & C sent BSV a demand for return of the $360,000 paid under the Lien Release Agreement along with a

---

**4.** BSV also requests that the Court construe the terms of the documents, as necessary; that it award BSV attorney's fees and costs; and that it grant other relief that the Court deems proper.

draft of a complaint to be filed in state court if BSV did not comply. Additionally, H & C continues to assert that it is entitled to the return of the $360,000, and possibly more in expectancy damages. This controversy is of sufficient immediacy and reality to make it ripe for adjudication.

## II. The Motion To Set Aside Entry Of Default

■ Rule 55(c) provides that a court may set aside an entry of default "[f]or good cause shown . . . ." The Fourth Circuit has not specifically defined "good cause," but it has directed that district courts should consider (1) whether the moving party has a meritorious defense or counterclaim; (2) the defaulting party's culpability for the default; (3) the prejudice to the non-moving party (here, BSV); and (4) the availability and effectiveness of sanctions less drastic. *See Payne ex rel. Estate of Calzada v. Brake*, 439 F.3d 198, 204–05 (4th Cir.2006); *Davis v. Williams*, 588 F.2d 69, 70 (4th Cir.1978).

■ These four criteria, in turn, must be "liberally construed in order to provide relief from the onerous consequences of defaults and default judgments," *Lolatchy v. Arthur Murray, Inc.*, 816 F.2d 951, 954 (4th Cir. 1987), and "[a]ny doubts about whether relief should be granted should be resolved in favor of setting aside the default so that the case may be heard on the merits." *Tolson v. Hodge*, 411 F.2d 123, 130 (4th Cir.1969).

### A. Meritorious Defenses Or Counterclaims

When a court must decide whether to set aside an entry of default, it has discretion to determine whether a proffered defense or counterclaim is meritorious. *Trueblood v. Grayson Shops of Tenn., Inc.*, 32 F.R.D. 190, 196 (E.D.Va.1963); *see generally* 10A Wright, Miller & Kane § 2697 (Civil 3d 1998). When it makes this determination, the court must bear in mind the principle

that default is a disfavored means of adjudicating disputes. *See Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 811 (4th Cir.1988).

■ However, at a minimum, the party seeking to overturn a default must proffer *some "evidence"*—not just a "conclusory assertion"—that would "permit a finding for the defaulting party or which would establish a valid counterclaim." *Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 812 (4th Cir.1988) (quotations omitted) (emphasis added); *see also Consolidated Masonry & Fireproofing, Inc. v. Wagman Const. Corp.*, 383 F.2d 249, 252 (4th Cir.1967). This showing of evidence should "underscore the potential injustice of allowing the case to be disposed of by default." 10A Wright, Miller & Kane § 2697. In other words, once a party is in default, it has the burden to show, by some amount of evidence, not by mere assertion, that it has a viable defense or a counterclaim. If the party cannot make such a showing, it fails the meritorious defense requirement.

■ In its Answer and Counterclaims,[5] H & C asserts that there was a valid contract between it and BSV, and that BSV breached this contract with its withdrawal letter of April 28.[6] Also in its Answer and Counterclaims, H & C asserts that BSV defrauded H & C by hiding (and/or causing SRK to hide) the fact that BSV had been subsidizing the Hotel's operating expenses. H & C's three count counterclaim mirrors its assertedly meritorious defenses. Therefore, the claims and defenses will be analyzed as one and the same.

### 1. H & C's Position On Breach Of Contract And Counterclaim Count I

H & C's contract claims consist of two basic assertions: (1) H & C claims first that the Lien Release Agreement did not termi-

---

5. H & C's Answers, Affirmative Defenses, and Counterclaims are intertwined. The same meritoriousness analysis applies to all three parts of its pleading, so the Court examines the claims together.

6. H & C asserts other claims related to the contract: BSV committed malfeasance by soliciting

bids on the demand note without notice and consent by H & C; BSV breached its contract with H & C by failing to conduct a "friendly foreclosure" on the Hotel. These claims depend on the existence of an enforceable contract between BSV and H & C.

nate on January 31, but rather, that H & C and BSV continued to negotiate the Lien Release Agreement and that these negotiations spilled past January 31 and led to the drafting of the First Letter, and that the $360,000 from the Lien Release Agreement was part of the First Letter. Second, and in turn, H & C asserts that it timely and validly accepted the First Letter by signing it and returning it to BSV on March 1.

Because H & C claims that the Lien Release Agreement culminated in the drafting of the First letter,[7] its claim that it is entitled to a return of the $360,000 BSV acquired under the terms of the Lien Release Agreement because of a breach of contract is moot if H & C's claim that it validly accepted the First Letter lacks merit. Therefore, at the outset, it is necessary to address the First Letter and its effect.

BSV delivered the First Letter to H & C on February 22. In order to accept the proposal made therein, H & C was required to sign the First Letter and return it to a specific officer at BSV by the close of business on March 3. On February 27, representatives from BSV met with Mr. Reza to go over the terms of the First Letter. At the meeting, Mr. Reza objected to several terms of the First Letter. As explained by BSV President and CEO J. Peter Clements:

> The [February 27] meeting lasted more than an hour; the subject matter of the meeting was Mr. Reza's objections to the terms of the [First] Letter.

During the meeting, Mr. Reza specifically objected to several different material terms of the [First] Letter. The [First] Letter required that a number of different legal entities owned and/or controlled by Mr. Reza be coobligors on any loan. Mr. Reza strenuously objected that he could not tie up his other businesses on the potential loan obligation to [H & C]. Mr. Reza also objected to the interest rate, and the prepayment fee. *It was clear to all attending the meeting that Mr. Reza had rejected the [First] Letter.* I advised Mr. Reza that BSV would review and consider his objections, and communicate further with him.

> As a result of the meeting, BSV prepared a revised Proposed Commitment Letter [i.e., the Second Letter], which was sent to Mr. Reza on March 3 and March 6, 2006.

Second Declaration of J. Peter Clements at ¶¶ 7–9. (emphasis added) Mr. Clements' declaration is supported in detail by the declaration of Robert S. Ford, a BSV officer who attended the meeting and took notes.

> During the February 27, 2006 meeting, Mr. Reza stated objections to terms of the [First Letter.] ... [D]uring the ... meeting, I made notes [on a copy of the First Letter] of some of Mr. Reza's objections and demanded changes. Examples of changes demanded by Mr. Reza, and memorialized in my notes made on BSV's file copy of the [First Letter], follow:

---

7. It is important to note here that this is the *only* window through which H & C claims to have a right to the $360,000 due to breach of contract. In its Answer and Affirmative Defenses and Counterclaim, H & C accepts that the Lien Release Agreement, with its January 31 deadline, was a valid contract, but states that "BSV extended the deadline for payment of the [$3.5 million] and/or entered into a new agreement with H & C incorporating the use of the deposit [the $360,000] ...." H & C's Affirmative Defenses ¶ 5.

Specifically, H & C asserts that the Lien Release Agreement provided that BSV could extend the January 31 deadline, and that BSV in fact did so:

> BSV extended and/or waived the "Lien Release Date", originally scheduled for January 31, 2006, pursuant to the terms and conditions st forth in the Lien Release Agreement, by virtue

of its continued negotiations and subsequent agreements with H & C.

and alternatively,

> BSV extended and/or waived the Lien Release Date of January 31, 2006, *de facto*, by virtue of the entry of BSV into continued negotiations and subsequent verbal and written agreements with H & C....

H & C's Counterclaim ¶¶ 14–15. *See also* H & C's Counterclaim ¶ 13 (noting language in the Lien Release Agreement that provided BSV the option to extend the January 31 deadline).

H & C's Answer, Affirmative Defenses, Counterclaim, and pleadings assert no other claim or theory for a right to the $360,000 under contract law. In other words, the entire universe of H & C's claim that it is entitled to the $360,000 from the Lien Release Agreement because of a breach of contract requires that BSV's and H & C's negotiations after January 31 led to the creation of an enforceable contract.

a. A term ... called for an interest rate of prime plus one and a quarter percent. Mr. Reza objected to the interest rate, and demanded prime plus one-half percent.

. . . .

b. .... Mr. Reza objected to a prepayment fee equal to three percent of all sums prepaid. Instead, he wanted a prepayment fee to be calculated based the [sic] value of the Hotel in a sale or at the time of a refinancing, with the fee based on the value exceeding $5 million.

. . . .

c. [T]he [First Letter] called for BSV to receive an exception-free title policy to the Hotel. At the time, property taxes were delinquent and the local authority had initiated collection efforts. Mr. Reza objected to having to pay the delinquent property taxes at closing.

. . . .

d. [T]he [First Letter] required H & C to pay all of BSV's costs and attorneys fees incurred in making the loan. Mr. Reza objected to this provision, and demanded a cap on such costs and attorneys fees.

. . . .

In addition to the objections reflected in my notes, Mr. Reza also objected to the provision on page 5 [of the First Letter] requiring other entities owned and/or controlled by Mr. Reza to be guarantors.

Declaration of Robert S. Ford.[8] Mr. Reza has not refuted the salient points respecting this meeting set forth in the affidavits of Messrs. Clements and Ford.

As a result of the February 27 meeting, BSV drafted the Second Letter and delivered it to Mr. Reza by multiple means on March 3 and 6. The parties met on March 30 to go over the terms of the Second Letter. Some time between March 30 and April 28, negotiations over the Second Letter broke down. BSV withdrew its offer in the Second Letter on April 28.

H & C does not dispute this account of events, yet it asserts that Mr. Reza timely and validly accepted the First Letter on March 1, four days *after* the February 27

meeting. Therefore, claims H & C, there is a valid contract between the parties that was based on the terms of the First Letter.

BSV points out, however, that under blackletter contract law, adopted by the Supreme Court of Virginia, an offeree who rejects an offer loses the power later to accept that offer:

> If an offer is rejected either by an absolute refusal, or by an acceptance conditionally, or not identical with the terms of the offer, or by a counter proposal, the party making the original offer is relieved from liability on that offer, and the party who has rejected the offer cannot afterwards, at his own option, convert the same offer into an agreement by a subsequent acceptance.

*Virginia Hardwood Lumber Co. v. Hughes,* 140 Va. 249, 124 S.E. 283, 286 (1924). The record here shows, clearly and convincingly, that Mr. Reza's objections to terms in the First Letter at the February 27 meeting were a rejection under well-settled Virginia law.[9]

H & C has not put forward any evidence that the account of what transpired at the February 27 meeting by Messrs. Clements and Ford is in error factually. Instead, H & C addresses this dispositive matter only indirectly with an inapposite legal argument, contending that the offer in the First Letter was valid until BSV withdrew it or H & C accepted it. That argument is, in light of *Virginia Hardwood,* entirely lacking in merit under the undisputed record in this action.

Even under the generous standards of Rule 55, the events of the February 27 meeting are fatal to H & C's claim that it accepted the offer contained in the First Letter. Under Rule 55, H & C is obliged to put forth some amount of evidence that would point out some "potential injustice [in] allowing the case to be disposed of by default." 10A Wright, Miller & Kane, Civil 3d § 2697. H & C needed to offer evidence that would forecast some prospect of a different outcome at trial. It has failed to do so. For purposes

---

8. Copies of Mr. Ford's actual notes from the meeting are attached to one of BSV's memorandums, and his declaration accurately reflects the substance of the notes.

9. Indeed, BSV drafted the Second Letter in response to Mr. Reza's objections to the First Letter.

of Rule 55, its claims regarding the First Letter are not meritorious.

Because H & C's claims and defenses regarding its acceptance of the First Letter are not meritorious, its claim that returned a signed acceptance of the First Letter by March 1 is of no legal significance. Also, H & C's claim that it is entitled to the $360,000 from the Lien Release agreement depends on a valid acceptance of the First Letter, and that claim also is of no legal consequence given the undisputed record that H & C rejected the First Letter. H & C makes several additional claims regarding the alleged contract. However, those claims all depend on there being a valid contract between H & C and BSV. Because there is none, those claims too are without legal effect.

In sum, H & C's claims and defenses on the alleged breach of contract issues have not been shown to be meritorious.

### 2. H & C's Position On Fraud (Actual And Constructive) And Counterclaim Counts II and III

■ H & C also asserts that BSV engaged in fraud, which are pled both as defenses and as Counts II and III of H & C's counterclaim.[10] When H & C and BSV entered into negotiations over the Hotel, BSV allegedly was subsidizing the Hotel's operating expenses at the rate of $9,000 to $13,000 per month. BSV allegedly did not tell H & C of this subsidy; neither allegedly did SRK. H & C alleges that BSV hid the subsidies from H & C; that BSV instructed SRK to do the same, and that, indeed, SRK did not reveal the subsidies to H & C during H & C's due diligence meetings with SRK; that had H & C known of the subsidies, it would not entered into the Lien Release Agreement; and that, as a result, H & C suffered damages.

The fraud-based defenses are not supported by evidence and the counterclaims have not been pled with the particularity required by Fed.R.Civ.P. 9(b). Therefore, the assertion of fraud cannot be regarded as meritorious claims or defenses within the meaning of Rule 55 jurisprudence.

Rule 9(b) requires that the "circumstances constituting fraud or mistake shall be stated with particularity." The "circumstances" include the "time, place, and contents of the false representations or omissions, as well as the identity of the person" making the representation or omission. 5A Wright, Miller & Kane § 1297; *see also Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir.1999). While the Federal Rules are rules of notice pleading, Rule 9(b) was designed to safeguard defendants from lightly made claims of acts involving moral turpitude, and to prevent plaintiffs from filing strike suits that are frequently advanced only for their nuisance or settlement value. *See* 5A Wright, Miller & Kane § 1296. In context of a Rule 55 analysis, the rule serves the same purpose by assuring that any allegedly meritorious claim sounding in fraud be pled with particularity before it can serve as grounds for setting aside the entry of a default.

The fraud claims in Counts II and III of the Counterclaim are not articulated with the specificity required by Rule 9(b). The fraud claims do not state the time or place of the alleged omissions. Nor do they identify the perpetrator of the alleged fraud. Thus, the fraud claims are not adequately pled because they are conclusory and lacking in the requisite specificity.

As previously explained, any meritorious defense must be tendered with supporting evidence that is sufficient to warrant a conclusion that it is fair and reasonable to allow the defaulting party to proceed to trial. H & C has proffered no evidence to show that there is a factual predicate for the conclusorily stated fraud-based claims and defenses.

It is true, as H & C contends, that H & C does not have to prove its case in order for the Court to find that there is a meritorious defense or claim. But it is also true that a finding that there is a meritorious defense or claim cannot rest on conclusory assertions.

---

10. Count II is a claim for actual fraud while Count III is a claim for constructive fraud. "Constructive fraud differs from actual fraud in that the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently although resulting in

damage to the one relying on it." *Evaluation Research Corp. v. Alequin,* 247 Va. 143, 439 S.E.2d 387, 390 (1994). In this case, the same conduct is alleged to constitute both actual and constructive fraud.

Something by way of evidence must support the assertion. Where, as here, the fraud claim lacks the requisite specificity under Rule 9(b) and there is no evidence offered to support the theory as a defense, the Court cannot find that the meritorious claim or defense requirement has been satisfied.

### B. Reasonable Promptness/Personal Responsibility

■ District courts analyzing "good cause" also determine the party's responsibility for the default, including whether the party took reasonably prompt action. *Payne ex rel. Estate of Calzada*, 439 F.3d at 204–05.

The record shows that H & C bears responsibility for its default. Upon receiving a copy of the Complaint on May 18, 2006, Mr. Scheil informed H & C that he would not handle representation in this action. H & C was then referred to Mr. Bayliss, but H & C did not retain him to represent it in this action.

At the evidentiary hearing, Mr. Reza asserted that Mr. Bayliss had accepted the representation of H & C. Mr. Reza also said that Mr. Bayliss left him with the impression that Mr. Bayliss had agreed to represent H & C. From the correspondence offered in evidence, from the affidavits of Mr. Mooty and Mr. Reza, and from the testimony of Mr. Bayliss, the Court finds that Mr. Bayliss did not agree to represent H & C and that Mr. Reza could not reasonably have believed that Mr. Bayliss had undertaken the representation.

The record here demonstrates, quite convincingly, that Mr. Reza is a sophisticated businessman who is not at all unfamiliar with the legal process. For reasons best known to Mr. Reza, he simply chose not to find out when an answer to BSV's complaint was due and then left the country for a three-week vacation without arranging for the representation of H & C in this action.

H & C bears responsibility for its failure to retain counsel and to apprise itself of the date of service of process. This is not a case in which the fault is attributable to counsel. Here, the defaulted party is responsible for the fact that a default was entered against it.

### C. Prejudice To BSV

BSV has not argued that it would be prejudiced by a set-aside of the entry of default. And, indeed, there is no indication that any evidence or witnesses will be unavailable because of the delay in the proceedings caused by H & C's default. BSV's ability to litigate its action for declaratory judgment has not been materially altered as a result of the delay.

### D. Alternative Sanctions

A district court should also consider the availability and effectiveness of sanctions less drastic than a default judgment. *See Payne ex rel. Estate of Calzada*, 439 F.3d at 204–05; *Davis*, 588 F.2d at 70.

Neither party has suggested the availability of a result less drastic than entry of default. Nor is such an alternative readily apparent. Indeed, there is no merit at all to the position of H & C that BSV breached any contract with H & C. Thus, there is no reasonable basis for requiring BSV to litigate over such a theory.[11]

Nor is allowing the fraud claim to proceed on its own as an affirmative claim an available alternative. Before the evidentiary hearings, H & C contended that it had a meritorious fraud defense. The Court ordered H & C actually to plead its defenses and counterclaims and to show that they were meritorious. *See* Docket No. 23. After the evidentiary hearings, the Court ordered H & C to plead its asserted meritorious defenses and claims and to proffer evidence to show that they were meritorious. As to the fraud claims, H & C responded by tendering a legally insufficient pleading and by offering no evidentiary support for its fraud theory. On this record, no other forms of alternative relief are available.

In sum, H & C has not shown that it should be relieved from the default and its motion to set aside the default will be denied.

### II. Entry Of Default Judgment

■ The standard of analysis for entering a default judgment mirrors the "good cause"

---

11. Thus, any defense based on that motion and Counts IV, V and VI of the Counterclaim, which

depend on the asserted breach of contract, likewise warrant no further proceedings.

analysis, performed above, for setting aside an entry of default. *See F.D.I.C. v. Danzig,* 1993 WL 478842, *2 (4th Cir. November 22, 2003) ("Where, as here, a court is ruling upon a plaintiff's application for a default judgment, it properly treats the defendant's opposition as a motion to set aside the entry of a default, which is assessed under Rule 55(c)'s good cause standard.") (citing *Meehan v. Snow,* 652 F.2d 274, 276 (2d Cir.1981)) (holding that "in considering the appellants' opposition to the motion for a default judgment, [it is proper] to apply the Rule 55(c) standard for setting aside the entry of a default.").[12]

The Court therefore applies those standards here. Accordingly, and for the reasons set forth above, the Motion For Entry Of Default Judgment filed by BSV will be granted.

### CONCLUSION

For the foregoing reasons, the Motions to Set Aside Entry of Default and to Enlarge Time to File Responsive Pleadings of the Defendant Host & Cook, LLC (Docket Nos. 9 and 10) will be denied, the Motion for Entry of Default Judgment (Docket No. 6) will be granted, and it will be declared that BSV does not owe H & C $360,000.00, or any amount of damages arising from the transactions that resulted in the Lien Release Agreement, the First Letter, or the Second Letter.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

---

**12.** The Fourth Circuit explained at length in *F.D.I.C.* that the same standard applies to motions to set aside entries of default as to motions to enter default judgment

because of the two-step process by which a default judgment is entered. First, under Rule 55(a), the clerk enters a party's default when that party has failed to plead or otherwise defend as provided by these rules ....' Fed. R.Civ.P. 55(a). After entry of the default, and upon application by the non-defaulting party, a default judgment may be entered. Fed.

R.Civ.P. 55(b). When the defaulting party opposes the entry of a default judgment, therefore, that party is effectively petitioning the court not merely to refrain from entering a default judgment, but also to set aside the entry of the default, which typically must be done before resuming the proceeding.

*F.D.I.C.,* 1993 WL 478842 at *2 n. 5. Unpublished opinions of the Fourth Circuit are not binding precedent. Nonetheless, they are useful analytical tools.