<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-1618**

BANK OF AMERICA, N.A.,

             Plaintiff - Appellant,

        v.

CHRISTOPHER ANDREW SANDS,

             Defendant – Appellee,

        and

 JAMES STEPHEN BRITT,

             Defendant.


Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Claude M. Hilton, Senior District Judge.  (1:10-cv-00731-CMH-JFA)


Argued:  May 16, 2012                  Decided:  July 18, 2012


Before WILKINSON, GREGORY, and FLOYD, Circuit Judges.


Affirmed by unpublished per curiam opinion.


**ARGUED:** E. John Steren, OBER KALER GRIMES & SHRIVER, PC, Washington, D.C., for Appellant.  Thomas W. Repczynski, OFFIT KURMAN, PA, Vienna, Virginia, for Appellee.  **ON BRIEF:** Michael A. Hass, Kristina J. Longo, OBER KALER GRIMES & SHRIVER, PC, Washington, D.C., for Appellant.  John B. Raftery, OFFIT KURMAN, PA, Bethesda, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Bank of America, N.A. (the Bank), a national banking association with its principal place of business in North Carolina, brought this action against Christopher Sands, a citizen of Virginia, accusing him, among other things, of actual and constructive fraud. According to the Bank, Sands made a number of misrepresentations related to his company's accounts receivable, which the Bank relied upon when issuing a loan to facilitate a third party's purchase of his company. The case survived motions for summary judgment and proceeded to trial. At the close of the Bank's case, the district court determined that there was insufficient evidence to send the case to the jury and granted Sands's motion for judgment as a matter of law. The Bank appeals this ruling. Because we agree with the district court that a reasonable jury would have lacked a legally sufficient evidentiary basis on which to find that Sands engaged in actual or constructive fraud, we affirm.

I.

Given the procedural posture of this appeal, we view the evidence in the light most favorable to the Bank and draw all reasonable inferences from that evidence in its favor. See Buckley v. Mukasey, 538 F.3d 306, 321 (4th Cir. 2008). The evidence presented at trial established the following facts.

3

Sands was the founder, co-owner, and chief executive officer of AC Technology, Inc., a company in the business of reselling hardware. From the company's inception, Sands's goal was eventually to sell it, preferably for cash. Because he desired a cash purchase of the company, he rejected multiple offers that contained noncash components. Ultimately, this perseverance paid off, and on July 1, 2008, MB Security Corporation purchased AC Technology for approximately $5 million in cash.

In effectuating this purchase, MB Security used a loan furnished by the Bank. The loan involved a line of credit, capped at $10 million, that allowed MB Security to draw varying amounts depending on the level of AC Technology's accounts receivable, which served as the collateral base for the loan. Hence, as the value of AC Technology's accounts receivable increased, so did the amount that MB Security could borrow, provided this amount could not exceed $10 million. This loan structure is known as "receivable financing."

As was to be expected, the Bank demanded certain documents relating to AC Technology's finances, particularly its accounts receivable, for determining how much to lend. Most pertinent to this appeal are documents referred to as accounts receivable aging (ARA) summaries. These ARA summaries listed AC Technology's accounts receivable, the customers to which they

4

related, and how long they had been outstanding. An account receivable could not be properly listed on an ARA summary until the product shipped to the purchaser. Until then, it remained a purchase order, not a billable account receivable.

To satisfy the Bank's requests for accounts receivable information, Sands sent ARA summaries to Michael Byrd and Earle Munns, co-owners of MB Security. He did not provide Byrd and Munns direct access to AC Technology's records and books. Byrd and Munns then sent ARA summaries to the Bank, which understood them to be receiving their information from Sands. Also, based on the information set forth in the ARA summaries, Byrd and Munns prepared borrowing base certificates (BBCs) for the Bank. After subtracting certain ineligible accounts receivable, BBCs calculated a gross accounts receivable availability number, which the Bank used to determine the line of credit.

In supplying information about AC Technology's accounts receivable to Byrd and Munns, Sands knew what did and did not constitute an account receivable. Prior to the sale of AC Technology, he actively participated in maintaining the company's accounting system and constantly reviewed its accounts receivable. He was aware that for a purchase to be listed as an account receivable in the information he was providing to Byrd and Munns, the product must have actually shipped. That said,

5

it was never Sands's practice to verify whether orders had shipped as planned.

Sands also appreciated that the Bank would rely upon the financial information he provided Byrd and Munns in its loan decisions. And, along those lines, he understood that Byrd and Munns were to supply the Bank with the accounts receivable information that he provided them. From these facts arises the reasonable inference that Sands anticipated that the Bank would base its loan decisions at least in part on the accounts receivable information that he furnished Byrd and Munns.

On the evening of June 27, 2008, three days before the loan closing, Sands sent an e-mail to Byrd and Munns with an ARA summary attached. Among the specific accounts receivable contained in this ARA summary were two that possess particular relevance here: an account receivable relating to a purchase by the Maryland Procurement Office (MPO) and an account receivable relating to a purchase by General Dynamics (GD). Sands had requested that the vendor for the MPO purchase ship the product earlier in the day and, as was customary for him, listed it as an account receivable without verifying that the product had actually shipped. To the extent they existed, similar details regarding the GD purchase were not provided. In any event, at the time Sands sent this ARA summary, neither the MPO purchase nor the GD purchase had in fact shipped.

Later in the night of June 27, after receiving the ARA summary from Sands, Byrd sent an ARA summary to the Bank via e-mail. But this ARA summary was not the same ARA summary that Sands had sent Byrd and Munns. Whereas Sands's ARA summary listed the total worth of the GD account receivable as $163,709.13, Byrd's summary listed its total worth as $4,469,509.13. And although Sands's ARA summary provided one MPO account receivable with a total worth of $2,007,460.66, Byrd's summary listed two MPO accounts receivable, one having a total worth of $25,980.00 and the other having a total worth of $2,010,000.00. Other discrepancies in values existed as well. Because of these differences, the two ARA summaries contained different amounts for the total worth of AC Technology's accounts receivable: Byrd's ARA summary listed total accounts receivable of $9,649,523.00, but Sands's ARA summary reported accounts receivable totaling only $4,896,514.65.

Byrd and Munns created these disparities by altering the ARA summary that Sands sent them. In making these alterations, Munns dictated to Byrd the values of accounts receivable for various accounts, which Byrd then entered. Nothing at trial

7

established that Sands represented these inflated values to Byrd or Munns.[1]

On the morning of June 29, 2008, Munns resent Byrd's June 27 e-mail with the above-described altered ARA summary to the Bank based on the understanding that it did not receive the prior one. He did not make any further changes to Byrd's ARA

---

[1] We have thoroughly examined the record regarding this point. At one point, regarding the value of the GD purchase, Byrd testified that he received the inflated number from Munns, and when asked where Munns obtained that number, Byrd stated that "[t]he General Dynamics was some conversations [Munns] claimed he was having with Mr. Sands." That statement is too ambiguous to yield a reasonable inference that Sands represented to Munns that the GD purchase was valued at over $4 million rather than the approximately $160,000 he listed in his ARA summary. This is particularly true in light of the other testimony. Munns testified that he did not know the source of the information regarding the GD purchase. And earlier in Byrd's testimony, he stated that he only assumed Munns obtained the information from Sands. Moreover, Byrd testified that Munns told him that the information he was including came not only from Sands, but from others. And, even then, he subsequently clarified that he did not entirely understand where Munns was receiving his information.

Also, in an attempt to show that Sands provided the information regarding the value of the GD purchase, the Bank points to a number of e-mails that Byrd sent it wherein he mentioned the value of the GD purchase and alluded to conversations with Sands. But we have reviewed these e-mails and find nothing to suggest that the value of the GD purchase came from these conversations. The fact that the e-mails contain references to both the GD purchase and conversations with Sands does not yield a reasonable inference that the value of the GD purchase came from him. In the end, even viewing the evidence in the light most favorable to the Bank, we find nothing establishing that Sands represented to Munns or Byrd the inflated values included in Byrd's ARA summary.

summary before resending it.  The following morning, on June 30, Byrd sent the Bank a BBC that listed the total amount of AC Technology's accounts receivable as $9,649,523.  The Bank, in deciding the amount of credit to extend, relied on this BBC and Byrd's ARA summary.  Had the MPO and GD accounts receivable not been listed in that ARA summary, the amount of available credit would have dropped significantly.  In fact, without the MPO and GD accounts receivable, the Bank would not have issued the loan to cover the purchase price because there would have been insufficient collateral.

The closing for the loan took place on June 30, 2008.  That morning, at 9:56 a.m., an AC Technology employee, Paul Ford, forwarded Sands an e-mail, the subject line of which read "FW: Orders."  The forwarded material in the body of the e-mail mentioned that the MPO purchase would not ship until mid-July.  According to Sands, because he was busy preparing for the closing, he did not read the e-mail that morning and it was not until the following day that he discovered the MPO order had failed to ship.  At 11:42 a.m. on June 30, Sands sent Byrd and Munns an e-mail from the same account to which Ford sent the e-mail regarding the expected shipment date for the MPO purchase.  Sands attached an ARA summary and informed them that it was "the A/R as of 8:30 am this morning June 30, 2008."  The MPO purchase remained listed as an account receivable on this ARA summary.

9

Its total worth was $2,135,268.47. Also still listed as an account receivable was the GD purchase. Its total worth, as on Sands's June 27 ARA summary, remained $163,709.13. But again, neither of these purchase orders had shipped.

At the closing, the Bank extended a loan of $5.5 million to fund MB Security's purchase of AC Technology. Of this $5.5 million, Sands personally received about $1.38 million. The next day, on July 1, MB Security closed on its purchase of AC Technology.

AC Technology subsequently defaulted on the loan, and the Bank undertook efforts to recover the balance it was owed. The Bank brought a lawsuit against Byrd alleging fraud. Byrd eventually settled with the Bank, agreeing to a nondischargeable judgment against him. The Bank also obtained a judgment against Munns. Nevertheless, at the time of Sands's trial, the Bank still maintained an outstanding balance of $4,377,722 on the loan.

The Bank filed a complaint against Sands and James Stephen Britt in the Eastern District of Virginia on June 29, 2010. The complaint alleged that Britt was an attorney and current co-owner of AC Technology who, on behalf of himself, Byrd, and Munns, negotiated and entered into the purchase and sale agreement with Sands. The Bank asserted causes of action for fraudulent misrepresentation, constructive fraud, common law

10

conspiracy to commit fraud, and statutory conspiracy to commit fraud.  The Bank's case survived motions for summary judgment.  On May 3, 2011, the Bank stipulated to the dismissal of Britt as a defendant.

The case against Sands proceeded to trial on May 9, 2011.  The next day, at the close of the Bank's case, the district court granted Sands's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), finding there was insufficient evidence to send the case to the jury.  Specifically, the district court concluded that the Bank had failed to provide evidence demonstrating that Sands knew the products relating to the MPO and GD purchases had not yet shipped, meaning that he did not make a knowing misrepresentation in listing them as accounts receivable.  The court also determined that the Bank did not rely on Sands's representations in determining the amount of credit to extend but instead relied on the altered information that Byrd and Munns sent it.  The Bank then filed this timely appeal.

## II.

We review de novo a district court's order granting a motion for judgment as a matter of law.  Buckley, 538 F.3d at 321.  In conducting this review, we apply the same standards as the district court.  Corti v. Storage Tech. Corp., 304 F.3d 336,

11

341 (4th Cir. 2002). Pursuant to this standard, a district court may enter judgment as a matter of law against a party on a claim only if, after the party has been fully heard on a dispositive issue, the court determines "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). Moreover, because our jurisdiction in this case rests on diversity of citizenship, we apply the substantive law of Virginia. See Universal Concrete Prods. v. Turner Constr. Co., 595 F.3d 527, 529 (4th Cir. 2010).

Virginia law recognizes claims for both actual fraud and constructive fraud. See Evaluation Research Corp. v. Alequin, 439 S.E.2d 387, 390 (Va. 1994). To prove actual fraud, claimants must provide evidence of "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." Id. Similarly, to sustain claims of constructive fraud, claimants must establish 1) "a material false representation"; 2) "that the hearer believed it to be true"; 3) "that it was meant to be acted on"; 4) "that it was acted on"; and 5) "that damage was sustained." Nationwide Ins. Co. v. Patterson, 331 S.E.2d 490, 492 (Va. 1985). "Constructive fraud differs from actual fraud in that the misrepresentation of material fact is not made with

12

the intent to mislead, but is made innocently or negligently although resulting in damage to the one relying on it." Evaluation Research, 439 S.E.2d at 390.

Claimants alleging actual fraud or constructive fraud must prove each element of the claim by clear and convincing evidence. ITT Hartford Grp., Inc. v. Va. Fin. Assocs., Inc., 520 S.E.2d 355, 361 (Va. 1999). "Clear and convincing evidence is such proof as will establish in the trier of fact a firm belief or conviction concerning the allegations that must be established." Thompson v. Bacon, 425 S.E.2d 512, 514 (Va. 1993). It requires "more than a mere preponderance" of evidence but less evidence than is necessary to prove a claim "beyond a reasonable doubt." Fred C. Walker Agency, Inc. v. Lucas, 211 S.E.2d 88, 92 (Va. 1975) (quoting Cross v. Ledford, 120 N.E.2d 118, 123 (Ohio 1954)) (internal quotation marks omitted).

We begin by recognizing that Sands made false representations of material facts. As the Bank asserts, he falsely represented to Byrd and Munns that the MPO and GD purchases were accounts receivable. The evidence, viewed in the light most favorable to the Bank, established that these purchases had not yet shipped and therefore could not properly be listed as accounts receivable. Sands nevertheless listed them as accounts receivable on his ARA summaries. And because the value of AC Technology's accounts receivable drove the

13

amount of the loan that the Bank would extend, these false representations were material.

We agree, however, with the district court that the Bank failed to provide evidence on which a reasonable jury could conclude that it relied upon Sands's false representations. For both actual and constructive fraud, claimants must prove reliance on the misrepresentations by the injured party. See Richmond Metro. Auth. v. McDevitt Street Bovis, Inc., 507 S.E.2d 344, 346-47 (Va. 1998). The Bank points to Sands's ARA summaries, which contained his false representations that the MPO and GD orders were accounts receivable. But the Bank did not rely on Sands's ARA summaries in making its loan decision. Rather, it relied on the inflated value of AC Technology's accounts receivable as reported in Byrd's BBC and ARA summary. And, as seen, Byrd's ARA summary did not simply relay Sands's representations to the Bank. Instead, Byrd altered Sands's information to raise the value of AC Technology's accounts receivable—his total value of the company's accounts receivable, $9,649,523, was significantly higher than the value that Sands represented, $4,896,514.65.[2]

---

[2] This number comes from Sands's June 27 ARA summary. In his June 30 ARA summary, he stated the total amount of AC Technology's accounts receivable was $6,335,373.82, which is still less than Byrd represented. The evidence at trial demonstrated, however, that the Bank did not rely upon Sands's (Continued)

14

Thus, it was Byrd's, not Sands's, false representations regarding the worth of AC Technology's accounts receivable that the Bank relied upon in deciding that enough collateral existed to extend the $5.5 million loan. No reasonable jury could have concluded otherwise. Accordingly, we agree with the district court that the Bank failed to provide legally sufficient evidence upon which a reasonable jury could find actual or constructive fraud. And having determined that the evidence was insufficient to show reliance by the Bank, we need not reach the district court's determination that a reasonable jury could not find by clear and convincing evidence that Sands had the requisite knowledge for actual fraud.

## III.

For these reasons, we affirm the judgment of the district court.

AFFIRMED

---

June 30 ARA summary, as it had already decided to extend the loan by that time.

15