PRESENT: Lemons, Goodwyn, Millette, Mims, and Powell, JJ., and Russell and Koontz, S.JJ.

HUGH M. CAPERTON, ET AL.

OPINION BY
v. Record No. 121046    JUSTICE DONALD W. LEMONS
April 18, 2013

A.T. MASSEY COAL COMPANY, INC.

FROM THE CIRCUIT COURT OF BUCHANAN COUNTY
Henry A. Vanover, Judge

In yet another chapter in the contentious story of litigation and controversy between Hugh M. Caperton ("Caperton") and Donald Blankenship ("Blankenship") and the companies they control, we consider whether the trial court erred in its application of the doctrine of res judicata.

Over the last fifteen years, litigation between Caperton and his companies and Blankenship and his companies has involved trips to many courts. These include suits in circuit courts in both Virginia and West Virginia, proceedings in the United States District Court for the Southern District of West Virginia, and appeals to this Court, the Supreme Court of Appeals of West Virginia, and the Supreme Court of the United States.

The lineage of this dispute is as follows. Two of Caperton's companies, Harman Mining Corporation ("Harman Mining") and Sovereign Coal Sales ("Sovereign"), Incorporated, first sued one of Blankenship's companies, Wellmore Coal Corporation ("Wellmore"), in May 1998 for breach of contract.

This case was litigated in the Circuit Court of Buchanan County, Virginia ("First Virginia Action"). Harman Mining Corp. v. Wellmore Coal Corp., No. 226-98 (Cir. Ct. of Buchanan County, Va. 1998). Caperton's companies prevailed. We later dismissed Wellmore's appeal. Wellmore Coal Corp. v. Harman Mining Corp., 264 Va. 279, 284, 568 S.E.2d 671, 673 (2002) (per curiam).

In October 1998, Caperton, Harman Mining, Sovereign, and Harman Development Corporation sued A.T. Massey Coal, Incorporated ("Massey"), for certain tort claims in the Circuit Court of Boone County, West Virginia. Caperton v. A.T. Massey Coal Co., No. 98-C-192 (Cir. Ct. Boone County, W. Va. 1998). Blankenship was president, chief executive officer, and chairman of the board of Massey. Massey removed the case to federal court. Caperton v. A.T. Massey Coal Co., 251 B.R. 322, 324 (S.D. W. Va. 2000). The federal court later remanded the case to the Boone County Circuit Court. Caperton v. A.T. Massey Coal Co., 270 B.R. 654, 656 (S.D. W. Va. 2001); see also A.T. Massey Coal Co. v. Harman Dev. Corp. (In re Harman Dev. Corp.), No. 98-01990-WSB-11, Adv. No. 7-00-0057, Jt. Mem. Op. and Order at 1 (Bankr. W.D. Va. Nov. 28, 2000).

Back in the West Virginia circuit court, Caperton and his companies won a substantial jury verdict, which Massey appealed to the Supreme Court of Appeals of West Virginia. On

2

its first consideration, the Supreme Court of Appeals of West Virginia reversed, but the opinion was later vacated because two justices who decided the case voluntarily disqualified themselves after the decision. Caperton v. A.T. Massey Coal Co. (Caperton I), No. 33350, 2007 W. Va. LEXIS 119, at *5-6 (W. Va. Nov. 21, 2007), vacated as noted in Caperton v. A.T. Massey Coal Co. (Caperton II), 679 S.E.2d 223, 229 n.1 (2008).

On its second consideration, the Supreme Court of Appeals of West Virginia again reversed and remanded the decision of the West Virginia trial court. Caperton II, 679 S.E.2d at 229. Caperton and his companies appealed this decision to the Supreme Court of the United States, arguing that another justice should have recused himself, because Blankenship and Massey contributed millions of dollars to the justice's election campaign. The Supreme Court of the United States agreed with Caperton and his companies and reversed and remanded the case. Caperton v. A.T. Massey Coal Co. (Caperton III), 556 U.S. 868, 890 (2009).

On its third consideration, the Supreme Court of Appeals of West Virginia again reversed and remanded the decision of the West Virginia trial court. The court determined that a forum selection clause in an agreement between the parties required that suit be brought in Virginia. Caperton v. A.T. Massey Coal Co. (Caperton IV), 690 S.E.2d 322, 328 (2009).

Caperton and his companies subsequently filed suit in Virginia in November 2010, bringing many of the same tort claims as they did just over twelve years earlier. Caperton v. A.T. Massey Coal Co., No. 771-10 (Cir. Ct. Buchanan County, Va. 2011) ("Second Virginia Action"). The Circuit Court of Buchanan County held that res judicata barred the Plaintiffs' claims. Whether this decision was correct is the issue we decide in this appeal.

## I. Facts and Proceedings Below

### A. Caperton's acquisition of the Harman mining operations, the Coal Supply Agreement with Wellmore, Wellmore's changing corporate structure, and bankruptcy

On January 1, 1993, Appellant Caperton acquired Harman Mining and Sovereign. He also formed Harman Development Corporation ("Harman Development") that same year. Caperton I, 2007 W. Va. LEXIS 119, at *7. Caperton, Harman Mining, Sovereign, and Harman Development were all plaintiffs to this action below, and are Appellants herein (hereinafter collectively referred to as "Plaintiffs"). The chart below details Caperton's organization of his companies:



Harman Mining and Sovereign were engaged in the mining and sale of metallurgical coal from a mine in Buchanan County, Virginia (the "Harman Mine").  In 1992, Harman Mining and Sovereign entered into a Coal Supply Agreement with Wellmore, whereby Harman Mining and Sovereign would supply a fixed output of coal from the Harman Mine to Wellmore each year, from 1993 through 2001.  Harman Mining, Sovereign, and Wellmore continued to fulfill their obligations under the agreement through 1996.

Effective January 1, 1997, Harman Mining and Sovereign entered into a new Coal Supply Agreement ("CSA") with Wellmore.  Because Caperton invested significant capital to improve the long-term prospects of the Harman Mine, the CSA reflected a substantial increase in price paid for coal by

Wellmore.  Wellmore was willing to pay a higher fee because it supplied LTV Steel Corporation ("LTV") with coal blended with the Harman Mine product, and the metallurgical qualities of that coal made it desirable to steel producers.  Harman Mining, Sovereign, and Wellmore all performed under the CSA through 1997.

Prior to July 31, 1997, Wellmore's corporate parent was United Coal Company ("UCC").  On that date, Massey, of which Blankenship was president, chief executive officer, and chairman of the board, acquired UCC.  On December 1, 1997, Wellmore informed Harman Mining and Sovereign that it would only accept a significantly reduced quantity of coal in 1998, 205,707 tons, instead of the negotiated amount, 573,000 tons.  Wellmore cited the force majeure clause of the CSA to excuse its performance.  In January 1998, Harman Mining and Sovereign tendered performance under the CSA.  Wellmore rejected the previously agreed-upon tender.

The effect of the tonnage reduction was the financial collapse of Harman Mining.  Caperton's ventures were unable to survive with Wellmore purchasing less than half of the amount agreed upon in the CSA.  Although Harman Mining and Sovereign attempted to compensate for the severely reduced demand, they were unable to do so.  Subsequently, Harman Mining and Sovereign filed for bankruptcy protection.

B.    Breach of Contract Suit in Virginia

On January 6, 2000, Harman Mining and Sovereign filed their first amended motion for judgment against Wellmore, the First Virginia Action, in the Circuit Court of Buchanan County ("circuit court").  The suit alleged that Wellmore breached the CSA as of January 1998 and that Wellmore's stated reason for its refusal to accept the 573,000 ton shipment of coal – force majeure – was without foundation.

To justify its declaration, Wellmore claimed that LTV determined it no longer was interested in purchasing the Harman Mine/Wellmore coal blend because LTV was shutting down its Pittsburgh processing plant.  Harman Mining and Sovereign alleged that Wellmore knew that LTV was not considering the shutdown of its Pittsburgh plant.  They also alleged that the actual reason LTV declined to continue business with UCC, Wellmore's parent company, was because Massey, upon purchasing UCC, attempted to sell LTV a different, inferior blend of coal.

The issues in the First Virginia Action were whether Wellmore refused to purchase the agreed-upon amount of coal, whether there was a force majeure event, and, if so, whether that event prevented Wellmore from supplying coal to LTV.  At the conclusion of the liability phase of trial, the jury found that Wellmore breached the CSA.  The circuit court limited

7

Harman Mining and Sovereign to lost profits for 1998.  The
jury returned a $6,000,000 verdict in favor of Harman Mining
and Sovereign and the circuit court entered judgment on May 7,
2001.

### C.    Events of 1997-1998

Prior to its July 31, 1997 acquisition of UCC, Massey had
tried unsuccessfully to sell its West Virginia-mined coal
directly to LTV.  Caperton IV, 690 S.E.2d at 330.  An internal
Massey memo, drafted prior to the acquisition of UCC,
recognized the risks of attempting this strategy.  The Massey
memo stated that if Massey ultimately purchased UCC and
Wellmore, the relationship between LTV and Wellmore might not
continue.  This was because LTV had little interest in
changing from Harman-sourced coal blends to Massey-sourced
coal blends.  Id.

After Massey's acquisition of UCC and Wellmore but before
August 5, 1997, Massey, fully appreciating the potential
consequences, "provided LTV with firm price quotes for coal
mainly from Massey Mines, not Harman coal, and insisted that
LTV make Massey its sole-source provider via a long-term coal
contract."  Id. (internal quotation marks omitted).  LTV
refused, and ceased buying coal from Wellmore.  Id.  On August
5, 1997 at Massey's direction, Wellmore for the first time
informed Plaintiffs that they should "be aware that LTV Steel

8

has announced plans to close one of its coking operations. Should this occur, Wellmore anticipates reducing the tonnage amount pro rata, in accordance with the force majeure provisions of the Agreement."

On December 1, 1997, at Massey's direction, Wellmore declared force majeure. Massey was aware that this would put the Harman companies out of business. Id. at 330-31. As the Supreme Court of Appeals of West Virginia noted, prior to the force majeure declaration,

> Massey acknowledged Wellmore was readily able to purchase and sell the Harman coal, but instead chose to have Wellmore declare force majeure based upon a cost benefit analysis Massey performed which indicated that it would increase its profits by doing so. Furthermore, before Massey directed the declaration of force majeure, Massey concealed the fact that the LTV business was lost and Massey delayed Wellmore's termination of Harman's contract until late in the year, knowing it would be virtually impossible for Harman to find alternate buyers for its coal at that point in time. Once Wellmore suddenly stopped purchasing Harman's output, Harman had no ability to stay in business. In the meantime, Massey sold Wellmore.

Id. at 331 (internal quotation marks omitted).

Between August 5, 1997 and December 1, 1997, Massey engaged in negotiations with Plaintiffs for the purchase of the Harman Mine. Id. at 330. During this period, Plaintiffs shared confidential information with Massey to accurately

9

reveal the Harman companies' worth.  Id.  Specifically, Massey learned about Harman Development, Harman Mining, and Sovereign's mining operations, including their desire to acquire and mine the adjacent Pittston reserves, and about Plaintiffs' finances, including Caperton's own personal finances.  Id.

After the force majeure declaration,

> Massey continued in negotiations with the Harman Companies and Mr. Caperton for Massey's purchase of the Harman Mine, and the parties agreed to close the transaction on January 31, 1998. However, Massey delayed and, as the circuit court found, "ultimately collapsed the transaction in such a manner so as to increase [the Harman Companies'] financial distress."  In addition, Massey utilized the confidential information it had obtained from the Harman Companies to take further actions, such as purchasing a narrow band of the Pittston coal reserves surrounding the Harman Mine in order to make the Harman Mine unattractive to others and thereby decrease its value. During the negotiations for the sale of the Harman Mine to Massey, Massey had also learned that Mr. Caperton had personally guaranteed a number of the Harman Companies' obligations. Subsequently, the Harman Companies filed for bankruptcy.

Id. at 331.

Massey's continuing effort to delay acquiring Harman Development, Harman Mining, and Sovereign continued throughout early 1998.  In February 1998, Massey produced a new agreement that was allegedly designed to resolve issues that led to the

10

January 1998 failure to close. However, Massey never followed through on this offer. The next month, Massey agreed to another closing date, March 13, 1998, which it also did not honor.

The Supreme Court of Appeals of West Virginia also noted the lower court's finding that "many of the steps Massey took were directed at Mr. Caperton personally." Id. at 331 n.16. Caperton "relied to his detriment on numerous false representations made by Massey," including the closing scheduled to take place on January 31, 1998. Id. Aware of Caperton's personal obligations to entities such as Inspiration Coal, Senstar Financial, Grundy National Bank, and Vision Financial, Massey's continued delay in closing the sale of the Harman companies not only detrimentally affected those companies, but also Caperton individually. Id. In the spring of 1998, Grundy National Bank obtained judgments against Caperton, and Senstar Financial filed suit to enforce Caperton's default on payment obligations for leased mining equipment.

D.   Tort Claims and Proceedings

On December 10, 1998, Plaintiffs filed their first amended complaint against Massey in the Circuit Court of Boone County, West Virginia (the "West Virginia Action"), detailing Massey's actions as recounted in Section C, supra, and

11

alleging tortious interference with existing and prospective contractual relations, fraudulent misrepresentation, civil conspiracy, and negligent misrepresentation.[1] A jury awarded the Plaintiffs approximately $50,000,000 in August 2002, which the trial court confirmed.

A lengthy appellate process ensued. See Caperton III, 556 U.S. at 874-76; see also Caperton IV, 690 S.E.2d at 332-33; Caperton II, 679 S.E.2d at 223, rev'd and remanded, 556 U.S. at 868; Caperton I, 2007 W. Va. LEXIS 119, at *1. On review of Plaintiffs' appeal concerning due process violations which resulted from the failure of a justice of the Supreme Court of Appeals of West Virginia to recuse himself, the Supreme Court of the United States characterized the evidence of judicial impropriety before it as "extreme by any measure." Caperton III, 556 U.S. at 887. This conduct took several different forms.

For example, before Massey filed its first appeal with the Supreme Court of Appeals of West Virginia, Blankenship contributed $3 million to the election campaign fund of an attorney, Brent Benjamin, who sought to replace a sitting justice on the West Virginia high court. Id. at 873. "To provide some perspective, Blankenship's $3 million in

_____

[1] Plaintiffs also included in their first amended complaint a count for punitive damages.

12

contributions were more than the total amount spent by all other Benjamin supporters and three times the amount spent by Benjamin's own committee."  Id.  Benjamin won election.  Id.

After the Supreme Court of Appeals of West Virginia's first reversal of the jury verdict, Plaintiffs sought a rehearing before that court, arguing that three of the five justices who decided the appeal should have recused themselves.  Id. at 874.  In addition to the campaign contributions detailed above, "[p]hotos had surfaced of Justice Maynard vacationing with Blankenship in the French Riviera while the case was pending."  Id.  Although two of the three justices disqualified themselves, the third, Justice Benjamin, denied Caperton's recusal motion.  Id. at 875. However, the Supreme Court of Appeals of West Virginia granted a rehearing, Caperton II, 679 S.E.2d at 229, and Caperton again moved to disqualify then-acting Chief Justice Benjamin. Caperton III, 556 U.S. at 875.  Acting Chief Justice Benjamin declined, and the Supreme Court of Appeals of West Virginia reversed the trial court for a second time in a 3-2 decision. Id.  Acting Chief Justice Benjamin joined the majority, and filed his own concurring opinion four months after the decision.  Id. at 876.  The Supreme Court of the United States granted Caperton's petition for a writ of certiorari.  Id.

The Supreme Court of the United States concluded that

13

> Blankenship's campaign contributions—in comparison to the total amount contributed to the campaign, as well as the total amount spent in the election—had a significant and disproportionate influence on the electoral outcome. And the risk that Blankenship's influence engendered actual bias is sufficiently substantial that it "must be forbidden if the guarantee of due process is to be adequately implemented."

Id. at 885 (quoting Withrow v. Larkin, 421 U.S. 35, 47 (1975)).

After all of the litigation and "bouncing" back and forth from the West Virginia trial court to the Supreme Court of Appeals of West Virginia and even the Supreme Court of the United States, the Supreme Court of Appeals of West Virginia ultimately dismissed the case, because it held that a forum-selection clause in the CSA required that Plaintiffs bring their tort claims in Virginia. Caperton IV, 690 S.E.2d at 354, 357.

On November 9, 2010, Plaintiffs filed a complaint in the Circuit Court of Buchanan County against Massey, the Second Virginia Action, alleging tortious interference with existing and prospective contractual and business relations, fraudulent misrepresentation/deceit/concealment, and seeking punitive damages. In response, Massey filed a plea of res judicata and

14

the statute of limitations.[2] Massey alleged that because all of Plaintiffs' claims arose out of Wellmore's declaration of force majeure, Plaintiffs "could have brought their tort and contract claims together in the First Virginia Action but chose not to do so." The circuit court agreed with Massey and sustained its plea.

Plaintiffs timely filed their notice and petition for appeal. We awarded them an appeal on the following assignments of error:

1. The Circuit Court erred in ruling that if a claim "could have been litigated" in a proceeding, it is barred by res judicata – irrespective of whether it was based on the "same evidence" used to prove, or arose from the "same transaction" as, the previously litigated claims.

2. The Circuit Court erred in ruling that the "same transaction" test rather than the "same evidence" test governs whether Plaintiffs' tort claims are identical to the contract claim in the First Virginia Action, in disregard of due process and fundamental fairness.

3. The Circuit Court erred in ruling that, under either the "same transaction" test or the "same evidence"

_____

[2] The plea of the statute of limitations remains unresolved. It is not before this Court on appeal.

15

test, Plaintiffs' tort claims against Massey are identical to the contract claim against Wellmore in the First Virginia Action.

4. The Circuit Court erred in ruling that Caperton and Harman Development are in privity with the plaintiffs in the First Virginia Action because of their controlling ownership of those plaintiffs.

5. The Circuit Court violated the due process clauses of the Virginia and U.S. Constitutions by interpreting Virginia res judicata law, as it existed between 1998 and 2001, in a way inconsistent with and not supported by this Court's precedents at that time, and applying that interpretation retroactively so as to deprive Plaintiffs of their constitutionally protected tort claims and any remedies for those claims.

## II. Analysis

### A. Standard of Review

Whether Plaintiffs' Second Virginia Action is precluded by res judicata is a question of law that we review de novo. Westgate at Williamsburg Condo. Ass'n v. Philip Richardson Co., 270 Va. 566, 574, 621 S.E.2d 114, 118 (2005). "[T]he one asserting the defense of res judicata-bar . . . must show by a preponderance of the evidence that the claim or issue should

16

be precluded by the prior judgment." Bates v. Devers, 214 Va. 667, 671, 202 S.E.2d 917, 921 (1974).

B.    Proceedings in the Circuit Court

On December 14, 2011, the circuit court concluded that "[h]aving found that all four elements of res judicata exist, the Court sustains the Defendant's Plea of Res Judicata based upon the First Virginia Action."  The circuit court, relying on Weinberger v. Tucker, 510 F.3d 486, 492 (4th Cir. 2007), held that privity existed between the plaintiffs in the First and Second Virginia Actions, because "[i]n Virginia, a controlling shareholder and a parent corporation have an identity of interest with the corporation the shareholder controls such that the two are in privity for the purposes of res judicata."  The court also held that the identity of the persons for and against the claim and the identity of remedies sought was the same between both actions.

The circuit court also considered whether the identity of the cause of action between the First and Second Virginia Actions was the same.  At the time of the First Virginia Action, the circuit court concluded, "Virginia applied the transactional approach followed by Bates and its progeny for the purpose of determining identity between two causes of action.  Under the transactional approach, it is patent that there is identity between the cause of action in the instant

17

matter and the First Virginia Action."  The circuit court further stated that

> [t]he facts giving rise to the breach of contract in the First Virginia Action and the facts giving rise to the tort claims in the instant action are related in time, space, origin, and motivation . . . . it is clear to this Court that Wellmore's declaration of force majeure was the paramount event leading to the breach of contract in the First Virginia Action.  It is equally clear that Wellmore's declaration of force majeure is the paramount event for the tort claims asserted in the instant action.

Because the court found that all four elements of res judicata existed, Massey's plea was sustained.  On March 21, 2012, the court entered its final order.

C.    The Law of Res Judicata in Virginia before Rule 1:6

Both parties agree that the law of res judicata as it existed in 1998, the time of the First Virginia Action, governs this Court's analysis.  Prior to the adoption of Rule 1:6, the law of res judicata in Virginia consisted of four elements.  Smith v. Ware, 244 Va. 374, 376, 421 S.E.2d 444, 445 (1992).  For res judicata to bar subsequent proceedings, a defendant must show "'(1) identity of the remedies sought; (2) identity of the cause of action; (3) identity of the parties; and (4) identity of the quality of the persons for or against whom the claim is made.'"  Id. (quoting Wright v. Castles, 232 Va. 218, 222, 349 S.E.2d 125, 128 (1986)).

In <u>Davis v. Marshall Homes, Inc.</u>, 265 Va. 159, 165, 576 S.E.2d 504, 506 (2003), a majority of the Court held that a circuit court erred in concluding that res judicata barred the plaintiff from bringing a cause of action for breach of contract.  The majority explained that identity of the causes of action was lacking between the plaintiff's two suits because

> [i]n her fraud action, plaintiff would have had to present evidence of the deed of trust notes and defendants' failure to satisfy those notes to show that she was damaged as a result of the misrepresentations. However, this evidence does not satisfy the remaining elements that plaintiff would have had to prove to establish a <u>prima facie</u> case of actual fraud by clear and convincing evidence. The mere fact that <u>some</u> evidence relevant in plaintiff's action for fraud may be relevant to prove her distinct and separate contract claim for nonpayment of the deed of trust notes does not, for purposes of <u>res judicata</u>, mean that plaintiff only has one cause of action.

<u>Id.</u> at 166, 576 S.E.2d at 507.

In <u>Davis</u>, a majority of this Court stated that our jurisprudence had previously settled any tension between the "same evidence" test and the "same transaction" test when it stated that

> just one year after this Court decided <u>Allstar</u> [<u>Towing, Inc. v. City of Alexandria</u>, 231 Va. 421, 344 S.E.2d 903 (1986)], we implicitly rejected the transactional analysis test in <u>Brown v.</u>

19

> Haley, [233 Va. 210, 355 S.E.2d 563
> (1987)], when we stated that "[t]he test to
> determine whether claims are part of a
> single cause of action is whether the same
> evidence is necessary to prove each claim."
> 233 Va. at 216, 355 S.E.2d at 567.
> Therefore, in accordance with our
> precedent, we explicitly reject the
> application of the transactional analysis
> test when deciding whether a claim is
> barred by res judicata.

Id. at 171, 576 S.E.2d at 510 (emphasis added) (citing State

Water Control Bd. v. Smithfield Foods, Inc., 261 Va. 209, 214,

542 S.E.2d 766, 769 (2001); Ware, 244 Va. at 376, 421 S.E.2d

at 445; Flora, Flora & Montague, Inc. v. Saunders, 235 Va.

306, 310-11, 367 S.E.2d 493, 495 (1988); Haley, 233 Va. at

216, 355 S.E.2d at 567).  Three Justices dissented.  Davis,

265 Va. at 172, 576 S.E.2d at 511 (Kinser, J., dissenting);

Id. at 185, 576 S.E.2d at 518 (Lemons, J., dissenting).

   The majority in Davis also stated that

> [i]n the present case, just as in Haley,
> the doctrine of res judicata is simply not
> applicable. The facts necessary to prove
> plaintiff's action for actual fraud are
> different from the facts she must prove for
> her action based upon nonpayment of the
> deed of trust notes. In the present appeal,
> as in Haley, there is "no identity of facts
> necessary to prove each claim."

Id. at 168, 576 S.E.2d at 508 (quoting Haley, 233 Va. at 217,

355 S.E.2d at 568).  The Davis opinion remained the law of the

Commonwealth until our adoption of Rule 1:6.[3]  It is apparent that at the time of Plaintiffs' suit, the same evidence test applied to determine whether identity of cause of action existed.  See Jones v. Morris Plan Bank, 168 Va. 284, 291, 191 S.E. 608, 610 (1937) ("If the same evidence will support both actions there is but one cause of action.").

D.    Does the Same Evidence Test Bar Plaintiffs' Second Virginia Action?

The evidence from the Second Virginia Action was different from the proof necessary to support the claims in the First Virginia Action.  Specifically, the First Virginia Action was based on breach of the CSA, where Harman Mining and Sovereign were required to show that: (1) The CSA legally

---

[3] Rule 1:6 states in relevant part:

> (a) Definition of Cause of Action. – A party whose claim for relief arising from identified conduct, a transaction, or an occurrence, is decided on the merits by a final judgment, shall be forever barred from prosecuting any second or subsequent civil action against the same opposing party or parties on any claim or cause of action that arises from that same conduct, transaction or occurrence, whether or not the legal theory or rights asserted in the second or subsequent action were raised in the prior lawsuit, and regardless of the legal elements or the evidence upon which any claims in the prior proceeding depended, or the particular remedies sought. A claim for relief pursuant to this rule includes those set forth in a complaint, counterclaim, cross-claim or third-party pleading.

obligated Wellmore to purchase a defined amount of coal; (2) Wellmore violated that obligation; and (3) Wellmore's breach caused damage to Harman Mining and Sovereign.  See Sunrise Continuing Care, LLC v. Wright, 277 Va. 148, 154, 671 S.E.2d 132, 135 (2009) (stating the elements of a breach of contract action).

Harman Mining and Sovereign were limited in their introduction of evidence to establishing these elements, and their proof primarily focused on whether Wellmore suffered a force majeure event.  Additionally, the circuit court in the First Virginia Action limited evidence on damages to Harman Mining and Sovereign's lost profits for 1998.  During the damages phase of trial, Wellmore itself characterized the First Virginia Action as concerning

> only the issue of any damages Wellmore caused [Harman Mining and Sovereign] as a result of the jury's determination that Wellmore wrongfully refused to accept 573,000 tons of coal from Harman [Mining and Sovereign] in 1998.  Evidence on any other subject has no relevance to the issue to be decided by the jury.

In contrast, Plaintiffs are required to introduce different evidence to support their claims of tortious interference with existing and prospective business and contractual relations, fraudulent misrepresentation, deceit,

22

and concealment.  A review of the elements of their claims

makes this abundantly clear.

For example,

> [t]o establish a claim for tortious
> interference with a business or contract
> expectancy, [the plaintiff is] required to
> show that (1) it had a contract expectancy;
> (2) [the defendant] knew of the expectancy;
> (3) [the defendant] intentionally
> interfered with the expectancy; (4) [the
> defendant] used improper means or methods
> to interfere with the expectancy; and (5)
> [the plaintiff] suffered a loss as a result
> of [the defendant's] disruption of the
> contract expectancy.

Preferred Sys. Solutions, Inc. v. GP Consulting, LLC, 284 Va.

382, 403-04, 732 S.E.2d 676, 688 (2012) (citing Maximus, Inc.

v. Lockheed Info. Mgmt. Sys. Co., 254 Va. 408, 413, 493 S.E.2d

375, 378 (1997)).  Harman Mining and Sovereign's breach of

contract action shares no elements with Plaintiffs' claim of

tortious interference with a business or contract expectancy.

The evidence required to sustain each action is therefore

different.  See Worrie v. Boze, 198 Va. 533, 539-40, 95 S.E.2d

192, 197-98 (1958) (holding that separate causes of action

existed because "[a]n essential element in the [current] case"

was "absent in the first").

Additionally, fraudulent misrepresentation requires that

a plaintiff show a "false representation of a material fact;

made intentionally, in the case of actual fraud, or

23

negligently, in the case of constructive fraud; reliance on that false representation to their detriment; and resulting damage." Klaiber v. Freemason Assocs., Inc., 266 Va. 478, 485, 587 S.E.2d 555, 558 (2003) (citing Evaluation Research Corp. v. Alequin, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994)). Fraudulent misrepresentation shares none of the elements of a breach of contract action, and the evidence required to support each claim is, therefore, manifestly different.

Plaintiffs' allegations further demonstrate that the First and Second Virginia Actions involve different causes of action. Even before Massey acquired Wellmore, Massey attempted to destabilize Harman Mining, Sovereign, and Wellmore's relationship with LTV.

> An internal Massey memorandum admitted during trial revealed that Massey understood there were risks to its plan, most notably the possibility that the relationship between LTV and Wellmore might not continue under Massey ownership of Wellmore. The circuit court found that, in spite of this risk, and despite the knowledge that LTV was extremely reluctant to change a long-established, successful coal blend that included coal from the Harman Mine, Massey nevertheless provided LTV with firm price quotes for coal mainly from Massey Mines, not Harman coal, and insisted that LTV make Massey its sole-source provider via a long-term coal contract.

24

Caperton IV, 690 S.E.2d at 330 (internal quotation marks omitted). Massey knew "that LTV had historically demonstrated a preference for multiple suppliers and had not entered multi-year coal supply contracts," and Massey similarly increased the price at which it offered to sell coal to LTV. Id. at 330 n.13. Not surprisingly, "LTV ceased buying coal from Wellmore." Id. at 330.

Massey also knowingly concealed the loss of LTV's business from Plaintiffs. Massey took this action in late 1997, according to the Supreme Court of Appeals of West Virginia, because it knew that "it would be virtually impossible for Harman to find alternate buyers for its coal at that point in time." Id. at 331. Massey's discussions to purchase the Harman companies were not pursued in good faith, because Plaintiffs had to shut down business operations in anticipation of a sale that never occurred. The Supreme Court of Appeals of West Virginia noted that the delay "ultimately collapsed the transaction in such a manner so as to increase the Harman Companies' financial distress." Id. (internal punctuation omitted).

Additionally, during negotiations for the sale of the Harman companies, Massey allegedly acquired confidential information about Caperton and his companies. "Massey utilized the confidential information it had obtained from the

Harman Companies to take further actions, such as purchasing a narrow band of the Pittston coal reserves surrounding the Harman Mine."  Id.  Explaining why Massey acquired the land, a Massey executive stated that

> [t]he property we have acquired provides a fairly effective block against anyone else cutting a deal with Pittston on the balance of their Splashdam coal.  It also greatly diminishes the attractiveness of the Harman property to parties other than Massey, so we will more than likely get Harman in the long run.

Massey's actions were not simply limited to Harman Development, Harman Mining, and Sovereign, however.  Having learned that Caperton personally guaranteed a number of the Harman companies' obligations, Massey made false representations to Caperton about the closing date for the sale of Harman Development, Harman Mining, and Sovereign, causing Caperton to default on those obligations.  Consequently, in the spring of 1998, both Grundy National Bank and Senstar Financial took actions that severely impacted Caperton's credit rating and creditworthiness.

Additionally, Massey's actions caused Caperton to be listed on the "Applicant Violator System," a database maintained by the Department of the Interior's Office of Surface Mining, which listing effectively prevents Caperton from conducting business in the mining industry in the future.

26

Finally, "[t]he [West Virginia] circuit court noted in its Final Order denying Massey's post-trial motions that Mr. Caperton suffered additional mental anguish due to Massey's trespassing on his personal property and photographing his personal residence."  Id. at 361 n.8 (Workman, J., dissenting).

It is clear that proof of these acts is not necessary to prove the breach of contract claims arising out of the CSA. Accordingly, since "[t]he test to determine whether claims are part of a single cause of action is whether the same evidence is necessary to prove each claim," Haley, 233 Va. at 216, 355 S.E.2d at 567, and because the same evidence from the First Virginia Action is not necessary to prove Plaintiffs' claims in the Second Virginia Action, res judicata will not bar the Second Virginia Action.[4]

### III.  Conclusion

We hold that the circuit court erred in determining that res judicata operates to bar Plaintiffs' action.  Accordingly, we will reverse the judgment of the circuit court, and remand for proceedings consistent with this opinion.

Reversed and remanded.

---

[4] Our holding makes it unnecessary to address the privity issue and the due process claim.